Michael Allen **TARNEF**, Appellant,

v.

**STATE** of Alaska, Appellee.

No. 1297.

Supreme Court of Alaska.

Dec. 30, 1971.

Edward R. Niewohner, Fairbanks, for appellant.

Stephen Cooper, Dist. Atty., Fairbanks, for appellee.

OPINION

Before BONEY, C. J., and RABINOWITZ, CONNOR and ERWIN, JJ.

BONEY, Chief Justice.

The appellant, Michael Tarnef, appeals from a conviction of both the possession and sale of heroin in violation of AS 17.-10.010.[1] Tarnef raises four specifications

1. Although the indictment under which Tarnef was convicted was issued on one count only, it charged Tarnef with both possession and sale of heroin in viola-

of error a denial of his right to a speedy trial; a failure to grant a judgment of acquittal; a refusal to declare a mistrial; and an abuse of discretion in imposing sentence.

█ We consider first the alleged denial of speedy trial.[2] Tarnef was arrested and incarcerated on July 3, 1969, pursuant to a complaint. On July 9, 1969, the evidence against Tarnef was found insufficient and the complaint was dismissed. Tarnef, however, remained in jail under other charges. On July 24, 1969, Tarnef was again charged with possession and sale of heroin, this time by grand jury indictment.

On August 6, 1969, the state filed a motion for setting an early trial. This motion was heard and granted on August 21, 1969, and on September 12, 1969, Tarnef's trial was set for October 27, 1969. Thus, the original date set for trial was three months and three days after issuance of the indictment, or about three months and three weeks from Tarnef's arrest and incarceration.

On September 30, 1969, slightly less than one month prior to the October trial date, the state initiated proceedings to compel attendance of an out of state witness, George Grant, to testify at Tarnef's trial. On October 1, 1969, the court in accordance with the specifications of AS 12.50.020,[3] certified the request for Grant's attendance.

Six days before the scheduled trial date, the state moved for a continuance of the trial, basing its motion on inability to locate its witness. Tarnef opposed the state's motion, claiming that a delay in trial would deprive him of his right to a speedy trial. He empasized that he had been imprisoned since he was initially arrested in early July, and argued that additional imprisonment would be harsh and oppressive. A hearing on the state's motion was held on October 23, 1969, and the motion for a continuance was granted.

Tarnef's case was not reset on the calendar until November 7, about a week and a half after the originally scheduled trial date. At that time, trial was rescheduled for February 2, 1970. Thus the delay occasioned by the first continuance constituted a period of slightly more than three months.

The case came on for trial as rescheduled on February 2, 1970. At the outset of the trial, however, the state moved for an additional continuance, basing the request on the continued absence of its witness, Grant. Tarnef's counsel adamantly opposed the state's motion, voicing the assertion that Tarnef's right to a speedy trial required the state to either proceed to trial immediately or dismiss the pending charge. The state rebutted the claim that Tarnef's right to a speedy trial would be denied, arguing that although Tarnef had been imprisoned since July, other charges had been pending against him and were equally responsible for his incarceration. The prosecution, further, emphasized the importance of its

---

tion of AS 17.10.010. According to AS 17.10.010:

> It is unlawful for any person to manufacture, possess, have under his control, sell, prescribe, administer, dispense, give, barter, supply or distribute in any manner, or compound any narcotic drug except as authorized in this chapter.

Under AS 17.10.230(13), opium is brought into the scope of narcotic drugs; AS 17.-10.230(11) in turn, includes heroin in the definition of opium.

2. U.S.Const. amend. VI provides in relevant part: "In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial . . . ." This provision was made applicable to the states through the due process clause of the Fourteenth Amendment in Klopfer v. North Carolina, 386 U.S. 213, 87 S.Ct. 988, 18 L.Ed.2d 1 (1967). Alaska Const. art. I, § 11 provides in relevant part: "In all criminal prosecutions, the accused shall have the right to a speedy and public trial . . . ."

3. AS 12.50.020 is a part of the Uniform Act to Secure Attendance in Criminal Proceedings (AS 12.50.010–080). The section specifies that upon issuance of a certificate by a judge of this state, presence of a witness may be secured in a criminal case if the witness is located in a state which also adheres to the Uniform Act.

missing witness, and requested a postponement of trial until March 9, 1970, stating that if Grant could not be retrieved by that time the charges against Tarnef would be dismissed. Although the judge equivocated somewhat the state's motion was ultimately granted.

The judge reset the trial for March 9, 1970. The March 9 trial date thus meant an extra delay of about 5 weeks. By March 9, about seven months and two weeks had elapsed from the date of indictment; Tarnef's total period of incarceration was several days in excess of eight months.

On March 9, 1970, Tarnef's case again came on for trial. This time Grant had been found, and the state was prepared to proceed. Tarnef, however, moved for dismissal on speedy trial grounds.

Each case alleging an unconstitutional deprivation of speedy trial must be considered in terms of its own particular facts and circumstances. Since speedy trial is a relative concept, this court, in determining whether a speedy trial had been denied, must balance the needs of the accused and the requirements of the judicial process in light of the purposes served by the speedy trial guarantees.[4]

In establishing this balance we believe it proper to consider at least three factors: the particular source of delay, the reasons for delay, and whether the delay prejudiced interests protected by speedy trial.[5]

In the recent cases of Glasgow v. State,[6] and Rutherford v. State,[7] which were published subsequent to the filing of this appeal, we held that prejudice may be presumed where the delay between the charge and trial exceeds fourteen months.[8] In those circumstances, we found reversal and dismissal with prejudice to be the proper remedy for the denial of speedy trial. Those cases did not, however, hold that prejudice to interests protected by speedy trial will be presumed where the challenged delay is substantially less than fourteen months. Rather, we qualified our holding in *Rutherford* stating:

> We do not mean to suggest by this holding that a converse presumption will be employed for less substantial delays— i. e., that prejudice will be presumed not to exist. Rather, the extent to which a showing of prejudice will be required in such cases will depend on the facts of each case. Generally, the longer the period of delay, the more willing the court should be to find a denial of the right to speedy trial without a showing of actual prejudice to the accused.[9]

It is not without significance that in each case where we have attached a presumption of prejudice from a delay in trial, that delay has exceeded fourteen months. In the present case, the delay between indictment and trial was about seven months and two weeks; the total period of incarceration

---

4. United States v. Ewell, 383 U.S. 116, 120, 86 S.Ct. 773, 15 L.Ed.2d 627, 631 (1966); Beavers v. Haubert, 198 U.S. 77, 86–87, 25 S.Ct. 573, 49 L.Ed. 950, 954 (1905); Rutherford v. State, 486 P.2d 946, 948 (Alaska 1971); Glasgow v. State, 469 P.2d 682, 688 (Alaska 1970); Spight v. State, 450 P.2d 157, 158–159 (Alaska 1969).

5. The three factors postulated were relied upon in Dickey v. Florida, 398 U.S. 30, 48, 90 S.Ct. 1564, 26 L.Ed.2d 26, 38 (1970) (Brennan, J., concurring). The three factors considered by Justice Brennan replace four factors commonly considered by the courts in speedy trial cases—length of delay, reason for delay, prejudice to the defendant, and waiver by the defendant. As Justice Brennan notes, the question of whether there was a waiver goes to the source of the delay, while the length of the delay is relevant to the consideration of whether there was prejudice as well as to the question whether the reasons for the delay were sufficient. *Id.* at n. 12. We adopt this approach as it is particularly helpful where undue incarceration is claimed.

6. 469 P.2d 682 (Alaska 1970).

7. 486 P.2d 946 (Alaska 1971).

8. *See also* State v. Mardock, Op. No. 743, 490 P.2d 1223 (Alaska, November 30, 1971) where the delay exceeded fourteen months and a presumption of prejudice was found.

9. 486 P.2d 946, 952 n. 16 (Alaska 1971).

was slightly in excess of eight months. We hold that from a delay of this length prejudice will not be presumed; we require, instead, that actual prejudice be shown. We consider next whether Tarnef has demonstrated the requisite prejudice.

In the present case, the source of the challenged delay was attributable to the absence of the state's witness, Grant. Against this alleged justification for delay we must balance claimed prejudice from (1) incarceration prior to trial, and (2) impaired ability to defend.[10]

We consider, first, the prejudice alleged to have resulted from incarceration. While we recognize that Tarnef was in some sense prejudiced by the eight month pre-trial incarceration, the question to be determined is whether the Alaska Constitution compels reversal for that prejudice in this case. We conclude that it does not. In reaching this conclusion we consider it crucial that the prejudice suffered did not reflect upon the accuracy of the fact finding process below. Rather, the prejudice incurred related exclusively to Tarnef's pre-trial incarceration and the anxiety generated by the pending charge. It is significant that the validity of the conviction is not affected by the prejudice which occurred.

In addition, we note that dismissal of an indictment with prejudice is a severe remedy where no impaired ability to defend is shown. In the absence of fundamental unfairness from subjection to the prosecutorial power of the state, we hesitate to invoke dismissal as a remedy. In the present case, no such fundamental unfairness occurred. It is relevant that during the approximately eight month period of Tarnef's incarceration, he was involved at varying stages from indictment to judg-

ment in five other felony prosecutions. Further, we note that during the months of November and December, Tarnef was tried on three of these charges. Four of these were brought by the State of Alaska, the fifth by the federal government.[11] In view of the numerous criminal prosecutions pending during Tarnef's incarceration, we find it significant that Tarnef has failed to show, and in fact has made no real attempt to show, that he would have not been incarcerated on other charges in the absence of the present action. In such circumstances, we cannot find such fundamental unfairness from prolonged incarceration as would require reversal. We conclude that the subjection of Tarnef to pre-trial incarceration did not amount to a violation of speedy trial in a constitutional sense.

Tarnef has also claimed prejudice to his ability to defend. This contention he bases upon a supposed inability to locate certain witnesses who would have impeached the state's primary witness, Grant. In the circumstances of this case the contention can only be viewed as unsupported.

The determinative factor is that Tarnef made no effort to call or prove his inability to call the allegedly unavailable witnesses at trial. Had he done so and had the witnesses proved unavailable, prejudice might appear. Where it is clear that witnesses once available are no longer available, it is arguable that prejudice should even be presumed. This results from the sometimes insurmountable burden of·trying to prove prejudice from the absence of testimony, when it is impossible to establish what that testimony would have included. However, where there is no showing of an attempt to locate a witness prejudice should hardly be

10. In the past, we have recognized that the right to a speedy trial protects against prejudice to both of these interests. Rutherford v. State, 486 P.2d 946, 947 (Alaska 1971); Glasgow v. State, 469 P.2d 682, 688 (Alaska 1970); Spight v. State, 450 P.2d 157, 159 (Alaska 1969).

11. These facts were not fully or adequately presented or argued to this court. However, we have on our own motion supplemented the record on appeal to include the relevant portions of the records in the charges noted. Included in the state actions were two charges of robbery, one charge of larceny, and one charge of arson. The federal charge involved larceny.

presumed. To adopt such an approach would allow any disappointed defendant to base an appeal on supposedly unavailable witnesses whom the defendant did not even attempt to call at trial.

We cannot countenance such a result. Thus, while we might justifiably presume prejudice where a witness has been shown to have become unavailable, we will not do so where no effort to procure the witness has been made. Tarnef failed to show that any witnesses were unavailable.

We conclude that in the circumstances of this case, prejudice to an interest protected by speedy trial is not present. In such circumstances, the protections provided by speedy trial have not been violated and Tarnef's claim cannot prevail.

■ In his second ground on appeal, Tarnef contends that the trial court erred in failing to grant his motion for acquittal. Since this motion challenged the sufficiency of the state's evidence, a thorough exposition of the testimony produced at trial is appropriate.

The prosecution in establishing its case relied primarily upon the testimony of George Grant. Grant readily acknowledged that he was a police informer. He admitted agreeing to set up a purchase of narcotics from Tarnef in exchange for which he and his wife were released from jail.

Grant testified that following his release from jail he was employed at the Arcade Pool Hall in Fairbanks. On July 1, Grant met Tarnef at the poolhall, and asked Tarnef if he had any heroin. According to Grant, Tarnef replied that he did and asked if Grant had money. Grant told Tarnef that he had no money at the time. Grant then arranged to meet Tarnef and purchase some heroin around 9:30 to 10:00 p. m. behind the poolhall. After his conversation with Tarnef, Grant called the district attorney and informed him of the arrangements.

According to Grant's testimony, at some time between 9:30 and 10:00 o'clock he went behind the poolhall. Tarnef appeared as expected; he was on foot. Grant re-

newed his inquiry as to whether Tarnef had heroin. Tarnef said that he did, and again asked if Grant had the money. Grant replied that he did. Tarnef then stated that he would go back to get the heroin, and left. Shortly after Tarnef's disappearance, another person, Nickerson, approached Grant and informed him that he had the heroin. Grant told Nickerson that he wanted to deal with Tarnef directly, and Nickerson left. After another brief pause, Tarnef reappeared on the scene, this time driving a pale yellow station wagon. Tarnef stopped his car near Grant. Grant asked Tarnef why he was no longer personally selling the heroin. According to Grant, Tarnef replied that he was not dealing in the streets anymore, and informed Grant that he would have to make the purchase from Nickerson. Tarnef then drove away.

After Tarnef disappeared for the second time, Grant walked to a nearby pickup truck with a camper on the back from which John Lucking, who was at the time assisting the district attorney, was keeping Grant under surveillance. Grant informed Lucking that he would have to make the buy from Nickerson, and then returned to his position on the street. Nickerson reappeared, again on foot, and handed Grant a foil wrapped package in exchange for $140. Grant immediately returned to the camper and gave the package to Lucking.

George Grant's testimony was substantially corroborated by three witnesses who had observed various portions of the transaction. Corporal Lucking of the Alaska State Troopers testified that on July 1, 1969, he was employed as an investigator for the district attorney in Fairbanks. He stated that he had been working along with Grant and the district attorney in an effort to have Grant purchase narcotics while under surveillance. On July 1, arrangements were made to give Grant money. It was contemplated that he would purchase narcotics on the street while under surveillance from two campers parked in the area. Participating with Lucking in the surveillance were Gerald Van Hoomissen, Fair-

banks District Attorney, and Walt Galetti, a friend of Van Hoomissen's.

According to Lucking, Van Hoomissen, Galetti and he first met with Grant in Van Hoomissen's camper. Grant was furnished with $200, and Lucking then took up his position in his camper. From his vantage point in the camper, Lucking enjoyed a view of Grant's location and he could also see Van Hoomissen's camper. Although there were several parked cars between Lucking's camper and Grant the camper's elevation resulted in his view being only partially obscured. Lucking watched as Grant left Van Hoomissen's camper, walked past Lucking's camper, and stationed himself on the street. With the possible exception of one period of several seconds duration, Lucking was able to keep Grant in view constantly until the transaction was consummated.

Lucking stated that he saw Tarnef approach Grant on foot. After a short conversation Tarnef left; nothing had changed hands. Lucking next saw Nickerson approach on foot, converse with Grant, and then depart. Following Nickerson's departure, Lucking observed a yellow station wagon pull up in front of Grant, stopping in the traffic lane. Grant conversed with the driver of the car. Though he could not identify the driver, Lucking did state that he had previously seen Tarnef driving the car; he further stated that the driver of the car was wearing a shirt similar in color to the one which Tarnef had been wearing.

After a short while, the car pulled away. Lucking stated that not long thereafter, he saw Nickerson reappear and hand something to Grant. Nickerson left once again, and Grant returned to Lucking's camper. Upon entering the camper, Grant handed Lucking a foil package and $60 cash. Lucking, Grant, and Van Hoomissen then went to Van Hoomissen's house where they were joined by an agent from the Federal Bureau of Narcotics. The agent performed a field test on a small portion of the substance found in the foil package; the test yielded positive results. Lucking kept the remain-der of the substance overnight, and sent it to the F.B.I. laboratory the following morning.

Galetti took the stand next. In substance, he confirmed Lucking's version of the occurrences leading up to the initial meeting with Grant in Van Hoomissen's camper. Galetti testified that he left Van Hoomissen's camper, followed a circuitous route passing around some buildings and stationed himself across the street and some distance away from Grant. He got to this position in time to see Grant talking to the driver of a station wagon which had stopped in the street. Galetti was able to identify the driver of the wagon as Tarnef. After Tarnef left, Galetti saw Grant go back to Lucking's camper, and followed. Then he returned to his position on First Avenue, again by a devious route; however, by the time Galetti managed to make his way back to the street, Grant's transaction had apparently been completed, so that Galetti witnessed nothing more of significance.

Gerald Van Hoomissen provided the final verification of Grant's story. He testified that on the night in question he received a call from Grant. Following the call, he met with Lucking and Galetti, and they proceeded in two campers to meet Grant. Lucking gave Van Hoomissen $200 and left Van Hoomissen's camper, returning to his own. Van Hoomissen searched Grant, and gave him the money; Grant then left Van Hoomissen, walked behind a building, turned toward his position on the street and was lost from view. Van Hoomissen stated that from his location, he could not see Grant. He did, however, see Tarnef walk by. Shortly thereafter he saw Nickerson walked down an alley toward Grant. Later he saw Tarnef again, driving by in a station wagon. Van Hoomissen also confirmed Grant's testimony as to his arrangement with the district attorney.

In presenting his defense Tarnef's counsel devoted his principal efforts to impeaching Grant through cross examination and several witnesses. Tarnef then took the stand in his own defense. He admitted his

presence on the scene as observed by Lucking, Galetti, and Van Hoomissen. However, he denied any connection with Nickerson. Rather, Tarnef explained, he had come to see Grant at the poolhall, had been informed that Grant was in back of the hall, and had walked back through the alley to find him. Tarnef claimed that he talked to Grant, that Grant informed him he was leaving town and asked Tarnef for a ride to the airport. Tarnef agreed, and went to get his car. When Tarnef returned to pick Grant up, he stopped, but Grant told him that he was not ready to go. Grant indicated that he would meet Tarnef in a short while at another location, and Tarnef drove off. According to Tarnef, he had not agreed to sell heroin to Grant and no mention of drugs was made by Grant on that night.

Tarnef's motion for a judgment of acquittal was based upon two grounds. First, that there was no evidence that Tarnef had been in actual possession of heroin as charged. Second, that the evidence showed Nickerson, not Tarnef, made the sale. The motion was denied on both grounds.

The court pointed out, as to the issue of possession, that Grant had testified that Tarnef had twice stated that he had heroin. Moreover, the court noted that while the indictment alleged both possession and sale of heroin, either possession or sale would suffice for conviction under AS 17.10.010. Insofar as the evidence of Tarnef's participation in the sale was concerned, the court indicated that even though Tarnef might not have actually sold the heroin, a jury could find him guilty of the substantive offense if he had aided in its commission. The court determined the evidence of aiding and abetting to be sufficient to go to the jury.[12]

In urging that the trial court erred Tarnef relies preliminarily on the fact that the state stipulated to a jury instruction which required a finding of both possession and sale. The thrust of Tarnef's claim seems to be that there was no evidence of actual possession. This, as the trial court correctly noted, is incorrect; testimony indicated that Tarnef had twice admitted having heroin on the night in question. Additionally, if the jury believed that Tarnef supplied Nickerson with the heroin, there is no obvious reason why the aiding and abetting theory could not be expanded to cover the possession charge.

■ The second, and principal, claim raised by Tarnef in relation to sufficiency of the evidence is that the entirely circumstantial evidence adduced against Tarnef at trial was insufficient to support a conviction. Here, Tarnef relies upon language in Gray v. State, 463 P.2d 897, 905 (Alaska 1970):

> This court has held that where the evidence against a defendant is entirely circumstantial a conviction can be sustained where the evidence is such as to exclude every reasonable theory consistent with the accused's innocence. (Footnote omitted).

It is Tarnef's claim that, since the evidence against Tarnef was wholly circumstantial, it was incumbent upon the state to affirmatively negate the possibility of any theory consistent with Tarnef's innocence. This, it is contended, the state has failed to do.

The problem posed by Tarnef's claim is identical to the one recently resolved in Jordan v. State, 481 P.2d 383, 386–387 (Alaska 1971). No detailed discussion of the problem is necessary here. The language from *Gray*, upon which Tarnef relies was taken from a test erected in Davis v. State, 369 P.2d 879, 882 (Alaska 1962). As we indicated in *Jordan*, this court subsequent to *Davis* dispensed with the use of that test. Allen v. State, 420 P.2d 465 (Alaska 1966). Tarnef presents no cogent

---

12. The trial court's conclusion is supported by AS 12.15.010, which abrogates the distinction between principals and accessories, and provides that anyone aiding or abetting the commission of a crime shall be prosecuted, tried, and punished as a principal.

arguments to support an overruling of *Allen,* and we decline, as we did in *Jordan,* to do so.

Tarnef's reliance upon *Gray* is illfounded and his contention must fail. An application of the standard announced in Bush v. State,[13] to the evidence presented at trial leaves us without doubt that the court was correct in denying the motion for judgment of acquittal.

■ In his third contention on appeal, Tarnef claims that the trial court erred in failing to grant a motion for a mistrial. The motion was based upon certain allegedly inadmissible and prejudicial testimony at trial.

During his cross examination of Grant, Tarnef's defense counsel asked several questions concerning Grant's previous attempts to purchase drugs from Tarnef. Through this questioning, Tarnef's counsel was able to show that from the 10th of June to July 1, 1969, Grant had failed in his attempt to purchase narcotics from Tarnef.

On redirect examination, the prosecution pursued a similar line of inquiry, and at one point in the examination asked:

Q. Were you able to buy any narcotics from Mr. Tarnef at any other time?

A. Yes.

Tarnef's counsel objected claiming the admission of testimony was highly prejudicial; a mistrial was requested. The motion was denied. The state did not ask Grant any further questions relating to the purchase of drugs from Tarnef.

On appeal, Tarnef contends that the state's question was an improper attempt to elicit evidence of prior misconduct, and that Grant's response was so prejudicial that a mistrial must be declared. The state opposes Tarnef's argument by contending that the question was proper under several alternative theories. We do not pass upon the propriety of the challeged question, for we have concluded that even if the question is assumed to be improper, it was not error to fail to grant a mistrial.

This court has held that whether to grant a mistrial is a matter for the trial court's discretion, and that the trial court will not be reversed unless its discretion has been clearly abused.[14] There is simply little in the present case to indicate an abuse of discretion on the part of the trial court. Only one question had been asked by the state and Grant's reply was a simple "yes"; details of prior drug sales by Tarnef were not brought out. Thus, while the information might have been inherently prejudicial, the form in which it was introduced was relatively inoffensive. Furthermore, the question asked by the district attorney related to an area which the defense had, whether it intended to or not, opened up. Moreover, as the state notes in its brief, there was, at the time that the question was asked, other testimony in the record from which the jury could have inferred previous sales of narcotics by Tarnef to Grant. Finally, it should be noted that the instructions submitted to the jury included an admonition that any evidence of other crimes committed by Tarnef should not be considered directly on the issue of his guilt or innocence.

Under these circumstances, then, the question of the admissibility of the challenged inquiry is of subsidiary importance, since it appears that, whether it was admissible or not, the trial court did not abuse its discretion in refusing to grant a mistrial.

■ In his fourth contention on appeal, Tarnef argues that the trial court abused its discretion in imposing a maximum sentence of ten years. We have reviewed the record and sentencing proceeding in accordance with the standards articulated in State v. Chaney, 477 P.2d 441, 444 (Alaska 1970),

---

13. 397 P.2d 616, 618 (Alaska 1964).

14. *See* Anderson v. State, 438 P.2d 228 (Alaska 1968); Maze v. State, 425 P.2d 235 (Alaska 1967); Steffa v. State, 391 P.2d 11 (Alaska 1964); and Eaton v. State, 390 P.2d 218 (Alaska 1964). For examples of decisions of other states upholding a trial court's denial of mistrial where potentially prejudicial questions were asked, *see* Gerstein v. State, 10 Md. App. 322, 270 A.2d 331 (1971); State v. Wilson, 1 Wash.App. 1001, 465 P.2d 413 (1970).

and find we cannot say that the judge was clearly mistaken in imposing the maximum sentence. In the past, we have indicated that maximum sentences are not to be imposed without some foundation for characterizing a defendant as the worst type of offender.[15] Here, as in Waters v. State,[16] the record does not necessarily establish Tarnef to be the worst type of drug offender, that is a smuggler or dealer in large quantities of narcotics.[17]

The single violation of our drug laws present here, standing alone, does not justify a ten year period of incarceration. On the other hand, here, as in *Waters*, various other factors support the sentence imposed and prevent us from concluding that the judge was clearly mistaken in imposing the sentence he did. While in the U. S. Army from 1964 to 1968, Tarnef was punished for AWOL and breaking restriction. When discharged, he had been reduced to the lowest enlisted grade.

The pre-sentence report indicates that Tarnef was essentially unemployed from the time of his discharge from the army in July of 1968 until the date of his arrest. He says he made a lucrative income from illicit gambling. It is implicit that Tarnef was engaged in criminal activities to support his expensive heroin habit. According to the report Tarnef admits to addiction from the heavy use of narcotics, including heroin, and in fact, classifies his use as excessive. Tarnef, the report reveals, considers himself dependent, both psychologically and physically upon drugs; he indicates that if released he would continue his use of drugs. The officer who prepared the report indicated that Tarnef was not willing to take steps necessary to effectuate rehabilitation, an opinion to which Tarnef's own evaluation lends credence. The officer concluded by recommending a maximum sentence.

The pre-sentence report also contained an evaluation of Tarnef by a probation officer at the institution at which Tarnef was incarcerated. While that officer considered Tarnef to be the institution's most intelligent inmate, he indicated that the institution classified Tarnef as an agitator and instigator without the willingness to apply his intelligence in a constructive manner. He further classified Tarnef as a psychopath "with no feelings about anybody", and without an interest in therapy. The officer concluded that there was little hope of rehabilitating Tarnef and recommended a maximum sentence in order to "protect society".

The factors propounded in the pre-sentence report indicate an antisocial nature and dangerous propensities clearly calling for a period of incarceration.

In view of these factors, it is apparent that a foundation existed for characterizing Tarnef as a particularly difficult type of offender. Considering the seriouness of the unlawful sale of heroin and the apparent need to protect society, we cannot say that the trial judge was clearly mistaken in imposing a ten year maximum sentence.

Affirmed.

---

15. Galaktionoff v. State, 486 P.2d 919, 924 (Alaska 1971) ; Waters v. State, 483 P.2d 199, 201 (Alaska 1971).

16. 483 P.2d 199 (Alaska 1971).

17. *Id.* at 201.