STATE OF CONNECTICUT *v.* WILLIAM F. FLOWERS
(12111)

HEALEY, DANNEHY, SANTANIELLO, CALLAHAN and PURTILL, Js.

Argued December 5, 1985—decision released February 4, 1986

*J. Robert Nastri,* certified legal intern, with whom were *Michael R. Sheldon* and *Todd D. Fernow,* for the appellant (defendant).

*Susann E. Gill,* deputy assistant state's attorney, with whom, on the brief, were *John M. Bailey,* state's attorney, and *Herbert Carlson* and *Carl Schuman,* assistant state's attorneys, for the appellee (state).

DANNEHY, J. A jury found the defendant guilty of murder in violation of General Statutes § 53a-54a. His sole claim on appeal is that he was denied his constitutional right to a speedy trial. We find no error.

On May 9, 1981, the defendant was arrested in Florida on a warrant charging him with the murder of Lee Jones in New Britain on February 9 or 10, 1981. The defendant promptly waived extradition and was returned to Connecticut on June 1, 1981. He was arraigned the following day and indicted on August 21, 1981. After numerous assertions of his right to a speedy trial, the defendant was finally brought to trial on November 3, 1982, and found guilty as charged on December 28, 1982. The defendant was unable to post bond and remained incarcerated during the entire eighteen month period between his arrest and the commencement of trial. Additional facts will be discussed as we consider the various aspects of the defendant's claim.

"The Supreme Court of the United States and this court have identified four factors which form the matrix

of the defendant's constitutional right to speedy adjudication: '[l]ength of delay, the reason for the delay, the defendant's assertion of his right, and prejudice to the defendant.' *Barker* v. *Wingo,* 407 U.S. 514, 530, 92 S. Ct. 2182, 33 L. Ed. 2d 101 (1972); *State* v. *Lloyd,* 185 Conn. 199, 208, 440 A.2d 867 (1981); *State* v. *Nims,* 180 Conn. 589, 591, 430 A.2d 1306 (1980)." *State* v. *Johnson,* 190 Conn. 541, 544–45, 461 A.2d 981 (1983). None of these factors standing alone would demand a set disposition; rather, it is the total mix which determines whether the defendant's right was violated. *State* v. *Nims,* supra, 592. While passage of time does not alone establish the defendant's claim that he has been denied his right to a speedy trial; *State* v. *Morrill,* 197 Conn. 507, 523–24, 498 A.2d 76 (1985); the state here concedes that the operative delay of seventeen months and twenty-five days is sufficiently long to prompt inquiry into the remaining factors set forth in *Barker* v. *Wingo,* supra. We proceed to a consideration of those factors.

On November 3, 1982, prior to the start of trial, the court conducted a hearing on the defendant's motion to dismiss based on the alleged denial of his right to a speedy trial. The court denied that motion in a written memorandum of decision dated December 2, 1982. In its memorandum the trial court found that the delay in this case was due to court congestion and not the result of any tactical decision on the part of the state. " 'On appeal, it is the function of this court to determine whether the decision of the trial court is clearly erroneous.' *Pandolphe's Auto Parts, Inc.* v. *Manchester,* 181 Conn. 217, 221, 435 A.2d 24 (1980); see Practice Book § 3060D. The trial court's conclusions must stand unless they are legally and logically inconsistent with the facts. *State* v. *Lasher,* 190 Conn. 259, 267, 460 A.2d 970 (1983)." *State* v. *Torres,* 197 Conn. 620, 625, 500 A.2d 1299 (1985). The defendant concedes that the rec-

ord adequately supports the trial court's finding that the local criminal docket was congested, but disagrees with the court's conclusion "that such demonstrated congestion was the operative cause of the instant delay." He contends instead that the delay was caused by the improper control of the state's attorney's office over the advancement of cases on the trial list and by the "failure of the judicial authority to afford the defendant a speedy trial when it was in its power to do so." The trial court specifically rejected both of these contentions and we must determine whether its decision was clearly erroneous.

The defendant during his lengthy pretrial incarceration frequently and unequivocally asserted his right to a speedy trial. He first requested his court appointed counsel to file a motion for a speedy trial on August 21, 1981, the day he was indicted. He filed such a motion pro se on October 30, 1981. By a letter to the court dated December 5, 1981, the defendant requested the appointment of new counsel because his then counsel had failed to press for a speedy trial. Finally, on February 1, 1982, the defendant's counsel filed a speedy trial motion. This motion was granted by the presiding criminal judge on February 10, 1982, but was subject to the "usual codicil that the case will not preempt other cases unless there's a compelling reason." The defendant continued to assert his right to a speedy trial until the November 3, 1982 hearing on his motion to dismiss.

At the hearing on the motion to dismiss the defendant called as a witness Raymond Cuatto, the chief criminal clerk for the Hartford judicial district. Cuatto testified that he maintains a master pending case list containing every case transferred from a geographical area court. Cuatto explained that cases are placed on the master list in chronological order. The older cases are then moved from the master list to a smaller list of cases ready for trial. Cuatto further testified that

he did not know how or by whom cases were ultimately selected from the trial list for trial on any given day. He could only state that his office received a typed or handwritten list containing four or five case names from the state's attorney's office several times a week. Cuatto would then call in for trial the cases on these lists. Cuatto also testified that at times cases were called in for trial out of chronological order. He recalled a case which was tried ahead of the defendant's case, even though the defendant was incarcerated and the other defendant was free on bond, and despite the fact that the defendant's case ranked number 85 on the trial list while the other defendant was listed as number 122.

The defendant's former court appointed counsel, who had by then withdrawn from the case, also testified at the hearing on the motion to dismiss. He stated that he had not filed a motion for a speedy trial sooner, as the defendant had requested, because he knew from experience that such motions were unlikely to cause a case to be advanced for trial. Counsel's impression as to the general futility of a motion for a speedy trial was corroborated by Cuatto, who testified from his experience that such a motion rarely achieved its desired result. The conclusions of these witnesses were uncontradicted and, in fact, borne out by the facts of this case.

The trial court in its memorandum of decision carefully considered the backlog of criminal cases in the Hartford judicial district while the defendant was awaiting trial. The court observed that as of December 14, 1981, there were 1852 active felony cases in Hartford Superior Court and that the average length of disposition was 18.6 months. The court further recounted the tremendous increase in criminal cases throughout the state and the concomitant reduction in proportionate funds allocated to the judicial department. This court is aware that by the early 1980's the mounting burden

of criminal cases in our courts had reached crisis proportions. The crisis reached its watershed in February, 1982, when the federal district court granted habeas relief and ordered the release of a convicted murderer because he had been denied his right to a speedy trial. *McCarthy* v. *Manson,* 554 F. Sup. 1275 (D. Conn. 1982), aff'd, 714 F.2d 234 (2d Cir. 1983). The trial court detailed the legislative response to the *McCarthy* decision, which led to the enactment of our speedy trial act; General Statutes § 54-82*l* (effective July 1, 1983); and the judicial response at the district level. In this regard the court noted that "a comparison of the volume of active cases pending in this court between October 31, 1981, and October 31, 1982, reflects a reduction of approximately 800 active cases resulting from an intensive effort by the court to meet constitutional standards as well as to prepare for the transition required next July under our new Speedy Trial Act."

We believe this record adequately supports the trial court's conclusion that docket congestion was responsible for the delay in this case. We find somewhat tautological the defendant's argument that, despite this congestion, "the criminal justice system had sufficient flexibility to afford him a trial earlier, had it been disposed to do so, and failure to exercise that flexibility rather than crowded court calendars was the reason for the substantial delay." The ingenuous assertion that the defendant *could* have been brought to trial sooner had the system been disposed to do so might honestly be said of any defendant awaiting trial during the period in question, and patently ignores the complex administrative difficulties which faced our then severely overtaxed criminal justice resources. Docket congestion, by its very nature, makes expeditious scheduling of cases for trial difficult, and requires the court to undertake some plan of action to reduce the

backlog. Very often such a plan may include such stop-gap measures as increased plea bargaining with reduced sentences, taking "ready" cases out of order, or trying shorter, less complicated cases first. As with any intractable situation, choices must be made. The defendant in his brief expressly disavows any challenge to the rationality of the plan devised to reduce the staggering criminal backlog then existing in the Hartford judicial district. Although the precise details of that plan are not before us, it appears from the testimony to have involved a concerted attempt to try cases in rough chronological order. That the defendant was not tried sooner under this plan is attributable not to official intransigence but to reasonable attempts to follow an established system of priority. To the extent that adherence to this system—even if not at all times absolute—caused the defendant to wait while others were tried before him, the delay is attributable to docket congestion and not to the fact that some method was developed in order to relieve it.

While apparently acknowledging what we have said thus far, the defendant contends that his case is distinguishable by his forceful and consistent assertion of his right to a speedy trial and because there was no evidence to indicate that any defendant chronologically ahead of him wanted a speedy trial or would have objected to the defendant's case being advanced on the trial list. We find the defendant's assertion of his right in this case to weigh heavily in his favor. We do not, however, believe that the defendant's exemplary assertion of his right can logically be integrated into this phase of his argument and thereby become transformed into a reason for the delay. The assertion of the right and the reason for the delay are separate factors entitled to independent weight under *Barker* v. *Wingo*, supra. Delay in the face of forceful assertion becomes less excusable for that very reason. We count the

defendant's assertion of his right heavily against the state, but we do so only once. We must, therefore, reject the defendant's attempt to bootstrap his argument with respect to the reason for the delay by incorporating therein the fact of his forceful and consistent assertion of his right to a speedy trial.

We also reject the defendant's claim that the delay was caused by the "inexplicable control" over the jury trial docket exerted by the state's attorney's office. The basis of this claim was Cuatto's testimony that he called cases in for trial from lists provided him by the state's attorney. From this testimony, and evidence that a more recent case was tried out of turn, the defendant contends that the trial court's rejection of his claim that the state's attorney's office engaged in selective advancement of cases was contrary to the evidence presented.

Control by the state's attorney's office over the calling of cases for trial would clearly violate our rules of practice. Practice Book § 973 provides, in pertinent part, that "[t]he judicial authority, acting through the clerk, shall control the time and the manner of scheduling all proceedings in criminal cases and shall have the cooperation of the prosecuting authority and defense counsel in carrying out his responsibilities." Cuatto testified that he did not know who selected the cases contained on the lists provided him. The trial judge, no doubt familiar with operational procedures employed in the courthouse where he worked, may reasonably have concluded that the lists submitted to Cuatto were prepared with the active participation or tacit approval of the presiding criminal judge, who bore the ultimate responsibility for the scheduling of criminal cases. Although the court must take special care to avoid even the appearance that its authority, and hence its neutrality, has been compromised, we recognize that an administrative relationship inevitably develops between

the presiding criminal judge and the state's attorney with whom he deals on a daily basis. Moreover, even assuming that the defendant could establish a clear violation of Practice Book § 973, it would not necessarily follow that improper control over case scheduling by the state's attorney's office caused the delay in this case. We note that the presiding criminal judge, and not the state's attorney, granted the defendant's motion for a speedy trial, but subject to the "usual codicil that the case will not preempt other cases unless there's a compelling reason."

The trial court in its memorandum of decision found particular significance in an instance where the same presiding judge had denied the state's motion to advance a case on the trial list which, according to the state, raised important questions of " 'public interest.' " The record adequately supports a conclusion that the presiding criminal judge, in close cooperation with the state's attorney, devised and followed a plan aimed at reducing the backlog of criminal cases. As previously noted, the defendant does not contest the rationality of the plan. If less than perfect in its conception and administration, the plan was nonetheless necessitated by a severely congested criminal docket and a criminal justice system underequipped to expeditiously manage it. Difficult problems breed uneasy solutions. But where, as here, a concededly rational plan is conscientiously undertaken in response to a difficult problem, we will not in the normal course accord it independent causal significance. In sum, we do not find clearly erroneous the trial court's conclusion that docket congestion was the reason for the delay.

While docket congestion does not justify or excuse delay; *State* v. *Davis,* 192 Conn. 739, 742, 474 A.2d 776 (1984); it is considered a neutral reason and is "weighed less heavily against the state than purposeful delaying tactics." *State* v. *Gasparro,* 194 Conn. 96, 100, 480 A.2d

509 (1984), cert. denied, 474 U.S.    , 106 S. Ct. 90, 88 L. Ed. 2d 74 (1985). This reason must nonetheless be considered "since the ultimate responsibility for such circumstance must rest with the government rather than the defendant." *Barker* v. *Wingo,* supra, 531.

The final *Barker* factor which we must consider is prejudice caused by the delay. As we stated in *State* v. *Lloyd,* supra, 209, "the linchpin of the speedy trial claim is a showing of prejudice . . . ." This prejudice may be actual or presumed; *Moore* v. *Arizona,* 414 U.S. 25, 26, 94 S. Ct. 188, 38 L. Ed. 2d 183 (1973); *State* v. *Morrill,* supra, 526; since none of the four factors identified in *Barker* v. *Wingo* is either a "necessary or sufficient condition to the finding of a deprivation of the right to a speedy trial." *Barker* v. *Wingo,* supra, 533. Thus, an affirmative showing of actual prejudice is not essential to a speedy trial claim when the defendant is able to show that the other three factors weigh heavily against the state. *Hoskins* v. *Wainwright,* 485 F.2d 1186, 1192–93 (5th Cir. 1973).

The defendant claims that the other three factors in this case weigh so heavily against the state that an affirmative showing of actual prejudice is not required. We disagree. The eighteen month delay here, while substantial, is not so extreme as to indicate a clear violation of the speedy trial right, and, indeed, is shorter than the delay in other cases where no violation has been found. *State* v. *Morrill,* supra, 522 (almost nineteen months); *State* v. *Gasparro,* supra, 100 (more than three and one-half years); *State* v. *Davis,* supra, 743 (twenty-six months); *State* v. *Lloyd,* supra, 209 (twenty-two months); see also *Barker* v. *Wingo,* supra, 533 (over five years); *United States* v. *McGrath,* 622 F.2d 36, 41 (2d Cir. 1980) (twenty-four months); *United States* v. *Lane,* 561 F.2d 1075, 1078 (2d Cir. 1977) (fifty-eight months). And the reason for the delay, court congestion, while not redounding to the state's credit, does

not weigh heavily against it. While the defendant's assertion of his right to a speedy trial weighs heavily in his favor, this factor alone is not sufficient to excuse a showing of actual prejudice. "The reason for dispensing with the prejudice requirement entirely when the other three factors point heavily toward a violation of speedy trial is deterrence; the prosecution should not be permitted to engage in inexcusable misconduct on the hope that the defendant will not be able to make out a case of [actual] prejudice. Where such misconduct has occurred, the state cannot complain that the legitimate interests of its criminal justice system, being pursued in good faith, are being sacrificed because of an honest mistake in a case in which no ultimate harm has been done." *Turner* v. *Estelle,* 515 F.2d 853, 858 (5th Cir. 1975), cert. denied, 424 U.S. 955, 96 S. Ct. 1431, 47 L. Ed. 2d 361 (1976); see also *Gray* v. *King,* 724 F.2d 1199, 1204 (5th Cir.), cert. denied, 469 U.S. 980, 105 S. Ct. 381, 83 L. Ed. 2d 316 (1984). In this case there has been no showing of misconduct on the part of the state sufficient to warrant a presumption of prejudice. We therefore proceed to consider the defendant's claims of actual prejudice.

Actual prejudice must be assessed in light of the interests which the speedy trial guarantee is designed to serve. These interests have been identified as: "(1) prevention of oppressive pretrial incarceration; (2) minimizing anxiety and concern of an accused; and (3) reducing the possibility of impairing the defense." *State* v. *Gasparro,* supra, 101; *Barker* v. *Wingo,* supra, 532. Of these three interests "the most serious is the last, because the inability of a defendant adequately to prepare his case skews the fairness of the entire system." *Barker* v. *Wingo,* supra; *United States* v. *MacDonald,* 435 U.S. 850, 860, 98 S. Ct. 1547, 56 L. Ed. 2d 18 (1978).

The defendant claims to have been prejudiced in a number of ways. He first claims that because of "tension and racial turmoil inside the Hartford jail, [he] was forced to spend 23 out of every 24 hours confined in his cell" during his lengthy pretrial incarceration. He further claims that due to his high bond he was officially labeled a "security risk" and thereby ineligible for work assignment inside the jail. Conditions at the jail also caused the defendant "a great deal of stress and anxiety, to the point where he was eventually forced to seek medical attention." The defendant also notes his limited ability "to communicate effectively with family and friends who might have aided his case. Throughout the entire period of his pretrial confinement he was permitted only one collect phone call per day, with a limit of 5 minutes placed on each such call."

We appreciate the dislocation and frustration an accused must necessarily experience while incarcerated and awaiting trial. The anxiety is heightened where, as here, the defendant urgently desires a speedy adjudication of his guilt or innocence. We further recognize that the anxiety attending pretrial delay is not ameliorated by the knowledge that under our law a convicted person receives full credit against a subsequent prison term for time spent in pretrial confinement. General Statutes § 18-98. While prejudice in the nature of that asserted here is unfortunately present in every case of pretrial delay, general claims of anxiety are thought insufficient to invoke what has been termed "the unsatisfactorily severe remedy of dismissal." *Barker* v. *Wingo*, supra, 521; *United States* v. *McGrath*, supra, 41; *United States* v. *Avalos*, 541 F.2d 1100, 1115 (5th Cir. 1976), cert. denied, 430 U.S. 970, 97 S. Ct. 1656, 52 L. Ed. 2d 363 (1977). The defendant's showing of anxiety and frustration is not sufficiently grave in this case to warrant dismissal of the charges against him.

The defendant also claims to have suffered actual prejudice in the preparation of his defense. Specifically, the defendant claims that due to the delay he was unable to procure for trial a witness who purportedly would have contradicted some of the state's evidence relating to the defendant's possession of the murder weapon. We review the evidence adduced at trial to properly evaluate this claim of prejudice.

In the early morning of February 10, 1981, New Britain police discovered the dead body of Lee Jones slumped over in the passenger seat of the defendant's automobile. The chief medical examiner testified that Jones died from a single .22 caliber bullet fired through his mouth and into his head. The medical examiner testified that the barrel of the gun was inside Jones' mouth resting on his tongue when the fatal shot was fired.

The defendant and Jones were first seen together the day before, February 9, 1981, at about 3 p.m., when they entered Russ' Cafe in New Britain. Jones and the defendant began to drink, and at some point thereafter Jones borrowed the defendant's car, and did not return to the bar until approximately 7 p.m. After Jones left once again at 7:15 p.m., the defendant became angry with Jones for taking so long to return his car. There was testimony that the defendant threatened to shoot Jones when he returned. In the presence of ten or eleven patrons the defendant pulled out a small caliber black revolver and fired a shot into the back of the bar. Russ Wilson, the owner of Russ' Cafe, told the defendant to pocket the handgun. In response to several patrons who speculated that he must have fired blanks, the defendant displayed the .22 caliber bullets remaining in the chamber. When Jones returned to the bar he apologized to the defendant and there was no further evidence of ill will between them at that time. Jones and the defendant eventually left Russ' Cafe together at about 11:30 p.m.

Sometime after 11 p.m. on February 9, 1981, Peggy Coscuna, a friend of the defendant, received a phone call from Barbara DeGrandis, the defendant's girlfriend and housemate, from the defendant's apartment in New Britain. After they had spoken briefly, the defendant came on line and asked Coscuna to come over because "something was going on." When Coscuna queried the defendant as to what this might be, the defendant replied that "I think I may have shot somebody." Coscuna arrived at the apartment about one half hour later, and the defendant reiterated his belief that he might have shot someone. In response to further questioning, the defendant stated that the person was in his car. Coscuna and DeGrandis persuaded the defendant to go to his car and take a look. The defendant went to his car and returned after several minutes. He confirmed that indeed there was someone inside who had been shot, and that the person was still alive and "kind of gurgling."

According to Coscuna, the defendant explained that earlier that evening he had loaned his car to someone whom he identified as "the kid." This person had taken too long to return the car and the defendant became angry. An argument flared up while the two were riding in the defendant's car, and the person started laughing. The defendant told Coscuna that "he put the gun up to the kid and said if you continue to laugh at me I'm going to blow your brains out." The "kid" continued to laugh and the defendant placed the gun barrel in his mouth. The defendant then stated that he thought he shot Jones. Coscuna testified that when she first entered the defendant's apartment she saw a gun on the kitchen table. After he had told Coscuna what happened, the defendant phoned two other friends, Melvin Brokow and Linda Shields, and asked them to come to his apartment. While awaiting their arrival, the defendant again began to relate the events of the

evening. Coscuna testified that during this time the defendant was more relaxed and "almost was bragging, you know, like ha-ha, this is what happened." The defendant was "waving" the gun around during his narration.

Shields testified that when she and Brokow arrived at the apartment the defendant told them that "Lee" had been shot because "he got in my face." According to Shields, the defendant stated that "he put the gun in [the victim's] mouth and went bang, bang, bang." She characterized the defendant's manner and tone as "very, very hateful and nasty." Shields also recalled that the defendant, while he spoke, was waving a black revolver back and forth.

Brokow's testimony as to the defendant's incriminating admissions was largely corroborative of Coscuna's and Shield's, and need not be repeated. Brokow stated that he went to the defendant's car to check on the victim and found that he was still breathing. Eventually, the discussion in the apartment turned to what to do about Jones. The defendant abandoned his car four or five blocks away from his apartment with Jones' body in it. Brokow disposed of the defendant's clothes and shoes, and took the handgun to East Johnson Avenue in Cheshire where he hid it.

Approximately seven months later, in September, 1981, Brokow showed police where he hid the gun and was present when they recovered it. Brokow admitted before the jury that at that time he was under arrest as an accessory to Jones' murder, but had entered into a written agreement with the state in exchange for his testimony. Brokow also admitted to various felony convictions, including nine counts of breaking and entering.

Expert ballistics testimony established that the gun identified by Brokow had been used to shoot Jones.

Tracing the gun by its serial number, police learned that it had been sold to Raymond Denker. Denker testified that he loaned the gun to the defendant, who never returned it. On cross-examination, Denker also admitted to having loaned the gun to Robert Wiley, his former upstairs neighbor, on a previous occasion. According to Denker, Wiley returned the gun to him after several days.

With this factual backdrop we proceed to the defendant's claim of actual prejudice. On February 10, 1983, the trial court conducted a hearing on the defendant's post trial motion to dismiss based on the alleged denial of his right to a speedy trial. The defendant claimed that pretrial delay caused Wiley to be unavailable to testify. According to the defendant, Wiley, who was in California on a job assignment during the defendant's trial, would have testified that Denker owed him money and had satisfied the debt by giving him the murder weapon sometime before February 9, 1981. Wiley purportedly would have testified that he never returned the gun to Denker, thus contradicting Denker's version of how the gun originally came into the defendant's possession.

The defendant called Harry VanWagner, Wiley's boss, to testify at the February 10, 1983 hearing on the motion to dismiss. VanWagner stated that Wiley had left Connecticut to supervise a construction job in California on September 27, 1982, and was expected back in March, 1983. The defendant's trial occurred in December, 1982. VanWagner testified that Wiley frequently was required to work out-of-state for several months at a time. VanWagner recalled that Wiley had also been in California from May to July, 1982, and in Connecticut from July until he left on his then present assignment. On cross-examination by the state, Van-

Wagner testified that information as to Wiley's whereabouts would have been available to anyone who contacted him.

A defendant's inability, due to pretrial delay, to locate a witness material to the defense would certainly constitute actual prejudice under the speedy trial guarantee. *Barker* v. *Wingo,* supra, 532; *Dickey* v. *Florida,* 398 U.S. 30, 38, 90 S. Ct. 1564, 26 L. Ed. 2d 26 (1970). In considering such a claim, however, the court must satisfy itself that the witness is in fact unavailable, and this requires some showing by the defendant that he has taken affirmative steps reasonably calculated to procure the witness for trial. *Tarnef* v. *State,* 492 P.2d 109, 113–14 (Alaska 1971); *State* v. *Knapp,* 123 Ariz. 402, 405, 599 P.2d 855 (1979) (due process); *State* v. *Evans,* 19 Or. App. 345, 527 P.2d 731, 735 (1975); *Phipps* v. *State,* 630 S.W.2d 942, 947 (Tex. Crim. App. 1982). Such witnesses are likely to be known only to the defendant, and he must bear the burden of establishing their unavailability. In the absence of this requirement, a defendant could always show actual prejudice by failing to summon a distant witness, known only to him, and then representing to the court the substance of his purported testimony. " '[I]f a defendant merely alleges . . . inability to locate known or unknown witnesses who might testify on his behalf, he has failed to illustrate prejudice with the required degree of specificity. *United States* v. *Ewell,* 383 U.S. 116, 122, 86 S. Ct. 773, 15 L. Ed. 2d 627 [1966]; *United States* v. *Churchill,* 483 F.2d 268, 273–74 (1st Cir. [1973]).' *State* v. *L'Heureux,* 166 Conn. 312, 321, 348 A.2d 578 (1974)." *State* v. *Johnson,* 190 Conn. 541, 546, 461 A.2d 981 (1983).

In the present case the defendant produced Van-Wagner at the post trial hearing to testify to the whereabouts of Wiley. Yet, the defendant does not claim to have made any attempt before trial to contact either

VanWagner or Wiley at his jobsite in California. The trial court in its oral decision on the defendant's February 10, 1983 motion to dismiss could not recall Wiley's name even having been mentioned as a potential source of prejudice in the course of pretrial proceedings on the defendant's first speedy trial hearing. We note that Wiley's presence at trial could have been secured by interstate subpoena. General Statutes § 54-82i (c). The defendant has not alleged any reason why Wiley, who maintains a permanent residence in New Britain, would not have returned to testify of his own accord had the defendant so requested. Moreover, given Wiley's frequent departures from the state, it is speculative whether he would have been any more available had the defendant's trial commenced sooner. VanWagner testified that Wiley was also in California between May and July, 1982, and, under the defendant's reasoning, Wiley would have been equally unavailable during that time. The state points out that Wiley would again have become "available" had the defendant's trial been delayed until March, 1983, when Wiley was scheduled to return to Connecticut. We conclude that the defendant has not made sufficient showing that Wiley was unavailable to testify, and that, in any event, Wiley's absence from trial was due more to the fortuity of his job assignments than to pretrial delay. State v. Johnson, supra, 546; State v. Troynack, 174 Conn. 89, 94, 384 A.2d 326 (1977); cf. State v. Jones, 46 Or. App. 479, 611 P.2d 1200, 1202 (1980).

Moreover, even assuming an adequate showing of Wiley's unavailability, the substance of his purported testimony would not have materially assisted the defendant's case. State v. Davis, supra, 746. Assuming that Wiley testified that he never returned the handgun to Denker, there would yet remain the uncontroverted testimony of several witnesses that the defendant possessed a black revolver shortly before and

shortly after the incident in question. The defendant's incriminating admissions before Coscuna, Brokow and Shields in his apartment were markedly consistent with his conduct and statements made earlier that evening at Russ' Cafe. Finally, while Wiley's purported testimony would have contradicted Denker's version of how the defendant initially obtained the handgun, it would not rule out his having acquired it at a later time. We cannot speculate on what, if anything, a thorough examination of Wiley might disclose. We believe that in this case a determination of actual prejudice cannot be made without the benefit of Wiley's actual testimony. Counsel have been aware of Wiley's status for some time now, and his testimony, if favorable, can best be developed in habeas corpus proceedings. On the record before us, however, we do not find that the defendant was prejudiced by Wiley's absence from the state during trial.

There is no error.

In this opinion the other judges concurred.