## STATE OF CONNECTICUT *v.* ROBERT J. FOSHAY
## (4663)

DUPONT, C. J., BORDEN and DALY, Js.

Argued March 6—decision released August 11, 1987

*John W. Watson,* assistant public defender, with whom, on the brief, was *Joette Katz,* public defender, for the appellant (defendant).

*Susann E. Gill,* deputy assistant state's attorney, with whom,on the brief, were *Brian E. Cotter,* assistant state's attorney, and *John Sheedy* and *William R. Korey,* legal interns, for the appellee (state).

BORDEN, J. The defendant appeals from the judgment of conviction, after a jury trial, of burglary in the

third degree in violation of General Statutes § 53a-103,[1] and of larceny in the third degree in violation of General Statutes § 53a-124 (a) (1),[2] and from the judgment of conviction, after a court trial, of being a persistent serious felony offender in violation of General Statutes § 53a-40 (b). The defendant claims that the trial court erred as follows: (1) he was denied his right to a speedy trial; (2) the court's instructions to the jury on accessory liability were defective; (3) the court's instruction to the jury on the larceny offense impermissibly allowed the jury to convict the defendant of an offense with which he was not charged; (4) there was insufficient evidence to convict the defendant of larceny in the third degree as charged in the information; (5) in admitting evidence of uncharged misconduct of the defendant; (6) in denying the defendant's motion to dismiss the charge of being a persistent serious felony offender; and (7) the defendant did not have fair notice that he faced enhancement of his sentence on both felony counts, based on the single persistent serious felony offender charge. We find no error.

The jury could reasonably have found the following facts: On the morning of October 5, 1983, Sharon Somers left her Danbury home, returning shortly after noon. Upon her return, she discovered that her house had been forcibly entered and ransacked. She immediately alerted the police. Several items of jewelry, including a gold and black onyx earring and a man's silver pocket watch, and a video cassette recorder, were missing from her house. The missing items were valued at more than $1000.

---

[1] General Statutes § 53a-103 provides in pertinent part: "A person is guilty of burglary in the third degree when he enters or remains unlawfully in a building with intent to commit a crime therein."

[2] General Statutes § 53a-124 provides in pertinent part: "(a) A person is guilty of larceny in the third degree when he commits larceny as defined in section 53a-119 and: (1) The value of the property or service exceeds one thousand dollars . . . ."

Somers' house is located just behind the parking lot of "Jimmy's Market," a convenience store. Around noon on October 5, Steven Costigan, the store manager, was in the parking lot. He observed a man running through the parking lot. Costigan was able to give a fairly detailed description of the man and had noticed that the man was carrying a brown and silver box-like item approximately twenty-four inches by twenty-four inches by eight inches. The man ran to an automobile which was parked, with the motor running, on the road next to the parking lot, about fifty feet from Somers' house. Costigan testified that there were two other people in the car, a male sitting in the driver's seat and an unidentifiable figure in the rear seat. Costigan observed the car's license number as it sped away.

Thereafter, a police officer arrived, inspected the victim's home, and took her account of what happened. The information given by the victim and Costigan was broadcast over the police radio.

Officer Ronald Inconstanti awaited the return of the automobile at the address of the car's registered owner. At approximately 1:25 p.m., the defendant drove the car into the driveway at that address. Inconstanti stopped the car. There were four persons in the car: the defendant, Robert Hyde, Warren Booth, and Deborah Schlemmer.

Hyde, the front seat passenger, had Somers' silver pocket watch in his left shirt pocket, her black onyx earring was in his cigarette pack. Her video cassette recorder was in the trunk of the car.

Costigan was brought to the scene of the arrest, where he identified the car driven by the defendant as the one he had seen parked next to his store earlier that day. He also identified Hyde as the man he had seen running to the car carrying a box-like object. He was not able to identify anyone else.

## I

The facts relevant to the defendant's speedy trial claim are as follows. On October 5, 1983, the defendant was arrested in connection with the charges for which he was convicted. At the time of his arrest, the defendant was on parole from a previous, unrelated indeterminate sentence. On the day of his arrest, the Connecticut department of correction, division of parole, filed a "parole sticker" against the defendant, pursuant to General Statutes §§ 54-127 and 54-128,[3] and ordered him remanded to the custody and control of the Bridgeport correctional center. The defendant remained incarcerated in that facility throughout the pendency of the proceedings in the trial court in this case.

On October 18, 1983, after entering a plea of not guilty, the defendant requested a speedy trial. On February 29, 1984, allegedly in compliance with Gen-

---

[3] "[General Statutes] Sec. 54-127. REARREST. The request of said commissioner [of correction], or any officer of the department of correction so designated by the commissioner, or said board of parole or its chairman shall be sufficient warrant to authorize any officer of the department of correction, or any officer authorized by law to serve criminal process within this state, to return any convict or inmate on parole into actual custody; and any such officer, police officer, constable or sheriff shall arrest and hold any parolee or inmate when so requested, without any written warrant, and, for the performance of such duty, the officer performing the same, except officers of said department, shall be paid by the state, through the department of correction, such reasonable compensation as is provided by law for similar services in other cases."

General Statutes § 54-128 provides in pertinent part: "Any paroled convict or inmate who has been returned to the custody of the commissioner of correction or any institution of the department of correction for violation of his parole may be retained in the institution from which he was paroled for a period equal to the unexpired portion of the term of his sentence at the date of the request or order for his return less any commutation or diminution of his sentence earned except that the board of parole may, in its discretion, determine that he shall forfeit any or all of such earned time, or may be again paroled by said board."

eral Statutes § 54-82c (a), the defendant's attorney sent a letter to the department of correction requesting that certain information be prepared and forwarded to the appropriate persons pursuant to that statute. The agent in charge of such matters refused to provide the information as requested because the defendant was not "in sentenced status." On March 2, 1984, the defendant again filed a motion for a speedy trial.

On March 22, 1984, the state informed the trial court that it was not ready to proceed to trial because the victims were out of state on vacation, and were due back in Connecticut on April 14. In response to this development, the defendant made an oral motion to dismiss the charges on speedy trial grounds. During the hearing on the motion, counsel for the defendant indicated to the court the difficulty he had had in locating witnesses and the increased risk posed by the passage of additional time for securing the attendance of a particular witness at a trial which would commence in the indefinite future.[4] The motion was denied by the court, *Moraghan, J.,* with the statement that if the state was not ready to proceed on April 24, the case would be "dismissed and dismissed summarily."

The defendant's case did not come to trial on April 24, 1984, because of a lack of judicial personnel

---

[4] "The Court: What's the presumption of prejudice you are talking about?

\* \* \*

"Mr. Carvalko [Defense Counsel]: Well, your Honor, several fold. One, there has been some difficulty in tracking witnesses. For instance, I believe that one witness in fact her name was changed for one reason or another. She actually moved and we had to put investigator's out to find her. At least what my investigator tells me she may get married and she may even leave the state; whether that occurs before April 14, I don't know.

"The Court: Did you find her?

"Mr. Carvalko: Yes.

"The Court: Is she under subpoena?

"Mr. Carvalko: Yes, at this point."

due to an ongoing criminal trial. On May 11, 1984, the defendant again filed a motion for speedy trial. After hearing argument on the motion on May 25, 1984, the court, *Maiocco, J.*, ordered that the state's case against the defendant would follow the trial of a defendant named "Skidmore."

After learning that there would not be a jury called during the summer months, on July 12, 1984, the defendant again filed a motion to dismiss for lack of a speedy trial. On July 20, 1984, the court, *Stodolink, J.*, denied the motion.

On September 12, 1984, the case against the defendant was called for trial. Prior to the commencement of trial, the defendant again made a motion to dismiss for lack of a speedy trial. In support of that motion, counsel for the defendant apprised the court of the difficulties he had in locating a key witness, Deborah Schlemmer, and serving her with a subpoena.[5] It is

---

[5] "Mr. Carvalko: . . . I believe if my recollection is correct, for sure on one occasion, probably more than one occasion, I apprised the Court that there was a very key witness by the name of Deborah Schlemmer who was in a position to observe my client, okay, during the events that ensued during this alleged crime and that statements she had made to the police in writing were very favorable to my client and that it was my concern that she might leave the jurisdiction. There were rumors that were circulating around town and that I was made aware of and I continued to emphasize that by that prospect occurring, my client would be gravely prejudiced.

"A couple of days ago when I learned that we were going to go on trial, I started going back over sources to discover her whereabouts and learned that she quit the employment that she had. She couldn't be located through her mother and we asked the investigator to serve her with a subpoena if she could be found. He went to a place this morning where he thought she might be and apparently she wasn't there. Maybe she's there and maybe she isn't, but she certainly didn't come to the door.

"So at this point we are left without what would seem to be a very key individual in this case and for that reason I feel that my prior pleas that this case would be—my client could be deeply prejudiced by not having that witness, have come to fruition and I would ask the court to dismiss the

apparent from the record that Schlemmer is the same witness to whom the defendant's counsel referred in his statement to the court on March 22, 1984. See foot-

counts against my client for lack of speedy trial notwithstanding the fact that he has been tried within the twelve months that the statute requires when one is incarcerated.

* * *

"The Court: The witness, from what you've said, Mr. Carvalko, is not missing. She just did not make herself available to your investigator to be served a subpoena is the way I interpret your statement.

"Mr. Calvalko: Your honor, if you interpreted it that way, I am—I apologize because I didn't mean to mislead the Court. My understanding, and we can ask Mr. Tom Bouley who's in the courtroom to take the stand and precisely to take it out of the realm of speculation, testify as to what occurred this morning, but I understand he went to the door, he knocked on the door and he did not see her. Obviously, we're thinking in our own mind that perhaps she's there.

"The Court: But you haven't given me any evidence that she has left this State, the State of Connecticut. You just say that nobody answered the door. There's a difference between not answering a door or being at work and not there or refusing to answer the door and being not within the State of Connecticut.

"Mr. Carvalko: Well, if we can't find her, your Honor—

"The Court: That's not what you said.

"Mr. Carvalko: Well, I've indicated we can't find her. She left her place of employment. Her mother indicates she doesn't know where she is and Mr. Bouley has made an attempt to serve her with subpoenas and can't locate her.

"The Court: Based on information that he knew where she was.

"Mr. Carvalko: Based upon information that he thought he knew where she was, yes.

"The Court: But he has no information that she does not live there.

"Mr. Carvalko: All right, your Honor.

"The Court: Is that true?

"Mr. Carvalko: I think that's true.

"The Court: All right then, as far as we know, she may still be living there.

"Mr. Carvalko: She may still be living there.

"The Court: She may not be living there, but you have not produced evidence to say that she's not. I'm not talking about—And in cases like this, we can't talk about possibilities. We have to talk about what is. Either she is available in the State of Connecticut someplace, may not want to testify, may not know that she's being asked to testify, may not know anything. If she's in the State of Connecticut and is subject to process, then your motion to dismiss is improper."

note 4, supra. Further, in support of his motion, the defendant called a former boyfriend of the missing witness, who testified that he had last seen her approximately two weeks before, and that she had been living at a particular Danbury address in the past but that he did not know where she was then living. The court, *Geen, J.,* denied the defendant's motion to dismiss. Thereafter, on September 12, 1984, voir dire examination of jurors began, and on September 14, 1984, the jury impaneled to decide the case against the defendant was sworn in, and testimony from the state's first witness was presented.

The defendant's claim that he was denied his right to a speedy trial takes two forms. First, he argues that the delay in trying him violated General Statutes §§ 54-82c[6]

[6] General Statutes § 54-82c, entitled "Prisoner's Right to Speedy Trial On Pending Charges," provides in pertinent part:

"(a) Whenever a person has entered upon a term of imprisonment in a correctional institution of this state and, during the continuance of the term of imprisonment, there is pending in this state any untried indictment or information against such prisoner, he shall be brought to trial within one hundred twenty days after he has caused to be delivered, to the state's attorney or assistant state's attorney of the judicial district or geographical area, in which the indictment or information is pending, and to the appropriate court, written notice of the place of his imprisonment and his request for final disposition to be made of the indictment or information. For good cause shown in open court, the prisoner or his counsel being present, the court may grant any necessary or reasonable continuance. The request of the prisoner shall be accompanied by a certificate of the warden, community correctional center administrator or other official having custody of the prisoner, stating the term of commitment under which the prisoner is being held, the time already served, the time remaining to be served on the sentence, the amount of good time earned, the time of parole eligibility of the prisoner and decisions of the parole board relating to the prisoner.

"(b) The written notice and request for final disposition referred to in subsection (a) hereof shall be given or sent by the prisoner to the warden, community correctional center administrator or other official having custody of him, who shall promptly forward it together with the certificate to the appropriate prosecuting official and court by registered or certified mail, return receipt requested.

"(c) The warden, community correctional center administrator or other official having custody of the prisoner shall promptly inform him in writ-

and 54-82d.[7] Second, he contends that the delay in trying him violated his right to a speedy trial under the federal[8] and state[9] constitutions. Since "[c]onstitutional issues are not considered unless absolutely necessary to the decision of the case"; *Edelson* v. *Zoning Commission,* 2 Conn. App. 595, 600, 481 A.2d 421 (1984); we first consider the defendant's statutory argument in support of his motions to dismiss on speedy trial grounds.

## A

The defendant contends that he was entitled to the protection against delayed trials afforded to inmates in Connecticut correctional facilities by General Statutes §§ 54-82c and 54-82d. Those provisions establish procedures by which a person who "has entered upon a term of imprisonment" within a state correctional facility may request a speedy disposition of outstanding Connecticut criminal charges. If a criminal case is

ing of the source and contents of any untried indictment or information against him concerning which the warden, administrator or other official has knowledge and of his right to make a request for final disposition thereof."

The defendant does not claim that he was denied his right to a speedy trial under Practice Book § 956B. Under that section, the defendant's trial was required to commence within one year from the date of the filing of the information. The state complied with that requirement in this case.

[7] General Statutes § 54-82d provides: "If an action is not assigned for trial within the period of time as provided in section 54-82c, no court of this state shall any longer have jurisdiction thereof, nor shall the untried indictment or information be of any further force or effect, and the court shall enter an order dismissing the same."

[8] The sixth amendment to the United States constitution provides, in pertinent part: "In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial . . . . " This constitutional right is made applicable to state prosecutions through the fourteenth amendment to the United States constitution. *Klopfer* v. *North Carolina,* 368 U.S. 213, 223, 87 S. Ct. 988, 18 L. Ed. 2d 1 (1967).

[9] Article first, § 8 of the Connecticut constitution provides, in pertinent part: "[I]n all prosecutions by indictment or information, the accused shall have a right to a speedy, public trial . . . ."

not brought to trial within the statutory period of 120 days from the delivery of the prisoner's request, accompanied by his custodian's certificate, to the appropriate prosecuting official and court, the case must be dismissed. *State* v. *Toste,* 198 Conn. 573, 585–87, 504 A.2d 1036 (1986); *State* v. *McCarthy,* 197 Conn. 166, 169–70, 496 A.2d 190 (1985).

The defendant, who was incarcerated prior to trial due to his inability to make bond, contends that because a "parole sticker" was also lodged against him, he had at that point "entered upon a term of imprisonment" within the meaning of § 54-82c, entitling him to the dismissal of the charges pursuant to § 54-82d. Because we conclude, however, that a parolee who is confined while awaiting a parole revocation hearing has not entered upon a term of imprisonment within the meaning of General Statutes § 54-82c, the defendant's statutory argument must fail.

General Statutes § 54-82c is patterned after a similar provision, codified at General Statutes § 54-186 and known as the Agreement on Detainers, which applies to prisoners who are incarcerated in one jurisdiction and face charges in another. A primary purpose behind both statutes is to alleviate problems posed by outstanding detainers on efforts at prisoner rehabilitation. At committee hearings on the bill which became General Statutes § 54-82c, Representative Marjorie D. Farmer noted that "[a]ny program of rehabilitation which is undertaken in a penal institution is ineffective if a man has time hanging over his head." Conn. Joint Standing Committee Hearings, General Law, Pt. 1, 1957 Sess., p. 229. Similarly, proponents of the Interstate Agreement noted that the uncertainty and anxiety accompanying outstanding charges often inhibits prisoner response to training programs and thwarts efforts at rehabilitation. See *United States* v. *Mauro,* 436 U.S. 340, 359, 98 S. Ct. 1834, 56 L. Ed. 2d 329 (1978). See

also Conn. Joint Standing Committee Hearings, Federal and Intergovernmental Relations, 1957 Sess., pp. 37–42. General Statutes § 54-82c, like § 54-186, then, provides a mechanism by which an inmate can remove the uncertainty of pending charges and can compel a speedy resolution of those charges.

At the time the defendant attempted to invoke the provisions of General Statutes § 54-82c, he was being held, at least in part, as a result of an alleged parole violation. See General Statutes § 54-127. Although the record is not clear on this point, it appears that no hearing had yet been held to determine whether in fact the defendant violated the terms and conditions of his parole and whether his parole should be revoked as a result. This would be in accord with procedures used by the board of parole, which provide that revocation hearings "shall be held within approximately sixty days of . . . the date of sentence for a new criminal offense." Connecticut Board of Parole, Statement of Organization and Procedures (6th Ed. 1979), 17. With regard to both the substantive charges pending against the defendant and his parole status, therefore, the defendant was in an essentially pretrial posture.

Because pretrial detainees possess no immediate interest in institutional rehabilitation programs, various courts, including our own Supreme Court, have recognized that such persons are not within the class of persons protected by detainer statutes. *State* v. *Toste,* supra, 586, citing *United States* v. *Reed,* 620 F.2d 709, 711 (9th Cir.), cert. denied, 449 U.S. 880, 101 S. Ct. 229, 66 L. Ed. 2d 104 (1980), and *United States* v. *Milhollan,* 599 F.2d 518, 528 (3d Cir.), cert. denied, 444 U.S. 909, 100 S. Ct. 221, 62 L. Ed. 2d 144 (1979). The federal Court of Appeals for the Third Circuit has noted that, even though the basis for a parolee's detention is the underlying sentence from which he has been paroled, until such time that the parole violator is

recommitted after a hearing and his incarceration thereby made certain and fixed as to duration, no term of imprisonment can be said to have commenced or resumed within the terms of the federal counterpart to General Statutes § 54-186. *United States* v. *Dobson,* 585 F.2d 55, 59 (3d Cir.), cert. denied, 439 U.S. 899, 99 S. Ct. 264, 58 L. Ed. 2d 247 (1978).

We find *Dobson* to be persuasive authority. Like the parolee in *Dobson,* the defendant in this case was not in the position of those inmates whom General Statutes § 54-82c was designed to protect. He had not entered upon a term of imprisonment with definite parameters. We therefore conclude that the defendant, who was incarcerated in a state correctional institution as a result of a "parole sticker" lodged against him, was not entitled to the protections afforded by General Statutes § 54-82c.

## B

We turn now to the defendant's constitutional speedy trial claim. The sixth amendment guaranty of a speedy trial is a fundamental right applicable to the states through the fourteenth amendment to the United States constitution. *Klopfer* v. *North Carolina,* 386 U.S. 213, 223, 87 S. Ct. 988, 18 L. Ed. 2d 1 (1967). "This right is also guaranteed by the Connecticut constitution, article first, § 8." *State* v. *Johnson,* 190 Conn. 541, 544, 461 A.2d 981 (1983). "The Supreme Court of the United States and [the Connecticut Supreme Court] have identified four factors which form the matrix of the defendant's constitutional right to speedy adjudication: '[l]ength of delay, the reasons for the delay, the defendant's assertion of his right, and prejudice to the defendant.' *Barker* v. *Wingo,* 407 U.S. 514, 530, 92 S. Ct. 2182, 33 L. Ed. 2d 101 (1972); *State* v. *Lloyd,* 185 Conn. 199, 208, 440 A.2d 867 (1981); *State* v. *Nims,* 180 Conn. 589, 591, 430 A.2d 1306 (1980). A balanc-

ing test is to be applied on a case by case basis. None of the factors standing alone demands a set disposition; rather it is the total mix which determines whether the defendant's right was violated. *State* v. *Nims,* supra, 591–92." *State* v. *Johnson,* supra, 544–45. Our consideration of the four *Barker* factors leads us to conclude that the defendant has failed to establish that he was denied his constitutional right to a speedy trial.[10]

"The length of the delay is to some extent a triggering mechanism. Until there is some delay which is presumptively prejudicial, there is no necessity for inquiry into the other factors that go into the balance." *Barker* v. *Wingo,* supra, 530. The protection afforded the defendant by the constitutional speedy trial guaranty was activated on October 5, 1983, when he was arrested. See *Dillingham* v. *United States,* 423 U.S. 64, 96 S. Ct. 303, 46 L. Ed. 2d 205 (1975). Voir dire examination of jurors began on September 12, 1984, and the defendant's trial commenced on September 14, 1984, when the jury was impaneled and sworn.[11] The state concedes, as it must, that a delay of eleven months and nine days is sufficiently long to warrant further inquiry. See *State* v. *Brown,* 172 Conn. 531, 536, 375 A.2d 1024, cert. denied, 434 U.S. 847, 98 S. Ct. 153, 54 L. Ed. 2d 114 (1977) (nine months delay sufficient to trigger further inquiry).

Application of the *Barker* balancing test next requires a consideration of the reasons for the delay. The delay

[10] Although the defendant relies on both the sixth and the fourteenth amendments to the United States constitution and article first, § 8 of the Connecticut constitution, he offers no separate analysis of the Connecticut constitution as a basis for different treatment of the federal and state constitutional claims. We decline to undertake such analysis. See *State* v. *Camerone,* 8 Conn. App. 317, 321 n.1, 513 A.2d 718 (1986).

[11] It is not necessary to determine in this appeal precisely when the defendant's trial began for speedy trial purposes, as the difference between September 12 and September 14 is not significant under the facts of this case.

in the present case can be divided into three segments, each of which had a different cause. The parties do not dispute the reasons for these periods of pretrial delay. The bulk of the first period of delay, from October 5, 1983, to March 22, 1984, can be attributed largely to the time required for normal pretrial procedures. The second period, from March 22 to April 24, 1984, was due to the unavailability of key state witnesses and holiday scheduling difficulties. The third period, from April 24 to the commencement of trial, appears to have been caused by calendar difficulties and a shortage of judicial personnel. "While docket congestion does not justify or excuse delay; *State* v. *Davis,* 192 Conn. 739, 742, 474 A.2d 776 (1984); it is considered a neutral reason and is 'weighed less heavily against the state than purposeful delaying tactics.' *State* v. *Gasparro,* 194 Conn. 96, 100, 480 A.2d 509 (1984), cert. denied, 474 U.S. 828, 106 S. Ct. 90, 88 L. Ed. 2d 74 (1985). This reason must nonetheless be considered 'since the ultimate responsibility for such circumstance must rest with the government rather than the defendant.' *Barker* v. *Wingo,* supra, 531." *State* v. *Flowers,* 198 Conn. 542, 550–51, 503 A.2d 1172 (1986).

As to the third *Barker* factor, the record in this case clearly demonstrates that the defendant vigorously requested a speedy trial on a number of occasions. "Delay in the face of forceful assertion becomes less excusable for that very reason. We count the defendant's assertion of his right heavily against the state . . . ." *State* v. *Flowers,* supra, 548–49.

The final *Barker* factor which we must consider is prejudice caused by the delay. Our Supreme Court has observed that "the linchpin of the speedy trial claim is a showing of prejudice." *State* v. *Lloyd,* 185 Conn. 199, 209, 440 A.2d 867 (1981). Prejudice may be actual or presumed; a showing of actual prejudice may not be required at all where other factors weigh heavily

against the state. *State* v. *Flowers,* supra, 551. In this case, the factors discussed above certainly weigh in the defendant's behalf, but not so strongly as to indicate a violation of his constitutional right to a speedy trial in the absence of a showing of actual prejudice. See id., 552 (finding that the analysis of the first three *Barker* factors in that case provided no showing of misconduct on the part of the state sufficient to warrant a presumption of prejudice); *State* v. *L'Heureux,* 166 Conn. 312, 348 A.2d 578 (1974).

Prejudice, in the context of a speedy trial claim, "should be assessed in the light of the interests of defendants which the speedy trial right was designed to protect. The [United States Supreme Court] has identified three such interests: (i) to prevent oppressive pretrial incarceration; (ii) to minimize anxiety and concern of the accused; and (iii) to limit the possibility that the defense will be impaired." *Barker* v. *Wingo,* supra, 532. Of these, the Supreme Court has pointed out, "the most serious is the last, because the inability of a defendant adequately to prepare his case skews the fairness of the entire system." Id.

The defendant claims to have been prejudiced in a number of ways. He first claims that the eleven months of pretrial incarceration had a negative psychological impact on him and resulted in the "disruption of his work, isolation from his family, [and] increasing pressure to accept some form of plea bargain in spite of his consistent claim of innocence." In addition, the defendant claims that his defense was impaired by his inability to assist his counsel in attempting to locate a piece of physical evidence, and by the unavailability of a critical defense witness who allegedly "was lost as a direct result of the delay."

As to the first type of prejudice asserted by the defendant, his showing of anxiety and frustration is not

sufficiently grave in this case to rise to the level of a constitutional violation. 'While prejudice in the nature of that asserted here is unfortunately present in every case of pretrial delay, general claims of anxiety are thought insufficient to invoke what has been termed 'the unsatisfactorily severe remedy of dismissal.' . . ." (Citations omitted.) *State* v. *Flowers,* supra, 553.

Similarly, the defendant's claim of prejudice to his ability to present a defense due to his inability to assist counsel in attempting to locate a piece of physical evidence must fail. At the March 22, 1984 hearing on his oral motion to dismiss, defense counsel stated: "[T]here is at least one set of circumstances that we have been trying to track down concerning something that was disposed of in a certain place. [The defendant's] mere incarceration has made it almost impossible to find this place. If he was not incarcerated we might have found that particular piece of evidence that we are looking for." Without any information as to what this evidence may have been or how it might have assisted the defendant, no finding of prejudice can be made. "Conclusory, vague or oblique allegations [of prejudice] are discountenanced." *State* v. *Johnson,* supra, 546.

The defendant's claim of prejudice to his ability to present a defense due to the unavailability of a key witness, however, presents a closer question. Recognizing, as it must, that "[i]f witnesses die or disappear during a delay, the prejudice is obvious"; *Barker* v. *Wingo,* supra, 532; the state argues that the defendant has failed to sustain his burden of establishing (1) that the testimony of the missing witness would have been material to the defense, (2) that the witness was unavailable due to the delay rather than some other factor of fortuity, and (3) that the witness was in fact unavailable, all of which are required to show prejudice to the ability to present a defense due to a missing

witness. See *State* v. *Flowers,* supra, 558–60; *State*
v. *Johnson,* supra, 546.

The missing witness in this case was Deborah Schlem-
mer. On October 5, 1983, Schlemmer made a sworn
statement before two members of the Danbury police
department. That statement is included in the appel-
late record and reprinted in full in the footnote.[12]

---

[12] At trial, the following statement was marked for identification by the
defendant, and included in the record, after the trial court precluded its
admission into evidence:

"STATEMENT OF DEBORAH L. SCHLEMMER

I, Deborah L. Schlemmer, give the following statement after being fully
advised of my constitutional rights. On October 5, 1983, I was at my home
at 22 Well Ave., Danbury, Conn. Fuzzy Robert Foshay came to my house
and with him was my boyfriend Warren Booth and Bobby Hyde, and
Foshay's wife and daughter. Warren wanted to sell a 19" TV to a Kenny
on Shepherd Rd. So after going to the bank and then to a store to buy soda,
Fuzzy dropped off his wife and daughter and the rest of us went towards
the Germantown area. Kenny already knew about the TV and he works
where Ace Glass used to be. His truck was there but Kenny was not there.
So we went to Kenny's house on Shepherd Rd. Warren got out of the car
and went to Kenny's door and knocked on the door several times but no
one was there. Warren came back to the car and said that Kenny was not
at home. No one answered the door. Fuzzy said where are we going now.
Bobby Hyde then said wait a minute and let me try. Warren said Bobby
don't go doing nothing. Warren said don't go and get me into any shit.
Bobby then went into the glassed in porch. While we were sitting in the
car. I saw Bobby knocking on the door. I heard two noises that sounded
like someone kicking in the door. Warren said let's get the hell out of here.
We pulled into Jimmy's Market on the side and then we went around the
block and then came back to Jimmy's Market and we found Hyde next to
Jimmy's Market standing with something large in his hands. Hyde got into
the front seat with the machine and said let's get the hell out of here. Bobby
Hyde said let's go and get rid of it and get some money. We went to Ciminos
Store. Fuzzy got out and came back with a soda. Fuzzy then drove us to
Eden Drive and Fuzzy got out of the car at the top of Eden Dr. and Bobby
Hyde drove while Warren and I stayed in the back seat. Hyde stopped at
the project, lower part. Hyde got out of the car and went to the door and
knocked. Both Hyde and the black man then came to the car and Hyde
showed the man the machine but the black man said that he did not have
the money, that he did not want it. Hyde got back into the car and we went
to pick up Fuzzy on top of the hill. Hyde got out of the car with the machine
and put it in the trunk of the car and we then drove off. Hyde wanted to

Schlemmer's statement portrays the burglary as hav-
ing been committed by Hyde alone, without the par-
ticipation or knowledge of the other occupants of the
car, including the defendant. If believed by the jury,
Schlemmer's expected testimony might have absolved
the defendant of criminal responsibility on the burglary
charge. See General Statutes §§ 53a-103; 53a-8. Addi-
tionally, as to the larceny charge, Schlemmer's state-
ment indicates that the defendant was only aware that
Hyde had stolen the video cassette recorder, which was
valued at approximately $800. If believed by the jury,
Schlemmer's expected testimony could be reasonably
expected to support only a finding of guilt as an acces-
sory to a misdemeanor larceny. See General Statutes
§§ 53a-125, 53a-119, 53a-8. Accordingly, since Schlem-
mer was a witness to the crime who could reasonably
be expected to offer testimony which would have
exonerated the defendant of the crimes with which he
was charged, her testimony was certainly material to
the defense.

Next, the state contends that the defendant has failed
to show that Schlemmer's alleged unavailability was
due to the delay rather than some other fortuitous fac-
tor. The record in this case does not support such a con-

sell the machine for $300.00 and he didn't know where to get rid of it. Fuzzy
said that there is a guy that he knew that might buy it but the phone num-
ber is at Fuzzy's house. So we drove to Fuzzy's house, went up the drive-
way, when we met the Police Officer who told us to stop right there. Shortly
after, other police arrived. I saw Hyde with a silver pocket watch and a
ladies gold watch in his hands while he was in the car. I do not know what
he did with it after the arrest.

I FULLY UNDERSTAND THAT IF I MAKE A STATEMENT THAT
IS UNTRUE AND WHICH IS INTENDED TO MISLEAD A LAW
ENFORCEMENT OFFICER IN THE PERFORMANCE OF HIS OFFI-
CIAL FUNCTION, I WILL BE IN VIOLATION OF SECTION 53A-157
OF THE CONNECTICUT STATE STATUTES. A FALSE STATEMENT
IS A CLASS A MISDEMEANOR.

/S/ DEBORAH L. SCHLEMMER"

clusion. On March 22, 1984, the defendant was ready to proceed to trial but could not do so due to the unavailability of prosecution witnesses. At that time, the defendant moved to dismiss the charges, apprising the trial court that, although he had subpoenaed Schlemmer for appearance at trial on that date, he had had difficulty locating her and that further and indefinite continuances might result in the disappearance of this witness. By the time his trial commenced, the defendant's concerns, expressed to the court nearly six months before, seemed to have come to pass. This is not a case where it is unclear whether the missing witness would have been available as a witness even if the defendant had been tried earlier. Compare *State* v. *Troynack,* 174 Conn. 89, 94, 384 A.2d 326 (1977). It is clear that the defendant would have had this essential witness available to testify at the time the case was first called to trial. Therefore, the defendant has successfully shown that delay was a cause of the unavailability of this material witness.

Lastly, the state argues that the defendant failed to establish that Schlemmer was in fact unavailable as a witness. *State* v. *Flowers,* supra, 558. The state correctly points out that proof of unavailability "requires some showing by the defendant that he has taken affirmative steps reasonably calculated to procure the witness for trial"; id.; but contends that "[t]he evidence and representations of counsel establish merely one unsuccessful attempt at serving Schlemmer with a subpoena and some confusion as to her exact address [which is] insufficient to establish her unavailability." We agree that the defendant failed to show that Schlemmer was in fact unavailable. This conclusion is fatal to the defendant's claim.

The defendant provided the court with the following evidence and representations of counsel regarding his efforts to find Schlemmer. A defense investigator

learned that Schlemmer had quit her job. The investigator could not locate the missing witness through her mother. On the morning on which the case was called to trial, the investigator went to Schlemmer's last known address to serve her with a subpoena, but no one came to the door. After the case had been called for trial, counsel for the defendant also questioned two witnesses in court in an effort to locate Schlemmer. Neither witness was in a particularly good position to know of Schlemmer's whereabouts. During the several days of trial, defense counsel also reported to the court that he was aware of a rumor that Schlemmer had been seen in nearby Brewster, New York, at three o'clock in the morning. No further efforts were made to locate the missing witness.

The defendant did not have to prove Schlemmer's unavailability to a certainty. *Flowers* only requires "some showing by the defendant that he has taken affirmative steps reasonably calculated to procure the witness for trial." Id. In other words, a defendant who claims that the absence of a material witness has prejudiced his ability to put forth a defense must show that he has exercised due diligence in attempting to locate the witness. See 17 Am. Jur. 2d, Continuance § 32; 3 F. Wharton Criminal Procedure (12th Ed. Torcia 1975) § 428.

Based on this record, we conclude that the defendant failed to exercise due diligence in his attempt to locate this key witness and secure her attendance at trial. The evidence shows that the defendant made only one attempt to subpoena Schlemmer at her last known address on the morning of the first day of trial. At a minimum, due diligence required more, particularly in the absence of any evidence that the missing witness was no longer living there. In fact, the testimony of Schlemmer's former boyfriend and a rumor which counsel brought to the court's attention during the trial indi-

cated that Schlemmer was still in the Danbury area within two weeks prior to the trial, and even during the trial. Nonetheless, the defendant made no further efforts to locate or subpoena Schlemmer during any of the six days of trial. Further, while the evidence shows that the defendant could not locate the witness through her mother, there is nothing to indicate that her mother knew of her daughter's whereabouts at any time relevant to this case.

Most significantly, there is no indication that the defendant sought to locate Schlemmer through any of a number of obvious and accessible sources, such as her landlord, neighbors, former employer, former co-workers, or other friends. While information from those individuals might not have succeeded in ultimately locating Schlemmer, they would have permitted the trial court to conclude that affirmative steps *reasonably* calculated to procure the witness for trial had been undertaken by the defendant. In the absence of a showing that such a diligent search was made, however, the trial judge was correct in concluding that the defendant had not shown that the missing witness was in fact unavailable. Therefore, we conclude that the defendant has failed to show that the delay resulted in prejudice to his ability to put forth an effective defense.

## II

The defendant next claims that the trial court erred in its instructions to the jury regarding liability as an accessory to the offense of burglary in the third degree. Specifically, the defendant contends that the challenged instructions failed to advise the jury adequately of the dual intent requirement of accessory liability under General Statutes § 53a-8, namely, the intent to aid the principal and the intent to commit the underlying offense. See *State* v. *Harrison,* 178 Conn. 689, 694, 425 A.2d 111 (1979).

Because the defendant neither requested a particular charge on accessorial intent nor excepted to the charge as given, he seeks review under *State* v. *Evans,* 165 Conn. 61, 327 A.2d 576 (1973). We have recently clarified our formulation for *Evans* review. We ask the following questions when an *Evans* claim is made and must answer each in the affirmative before continuing to the succeeding question: (1) does the defendant raise an issue which, by its terms, implicates a fundamental constitutional right? (2) does a limited review of the record show that the defendant's claim is truly of constitutional proportions and not simply characterized as such by the defendant? (3) was there, in fact, based on the record, a deprivation of a constitutional right of a criminal defendant? and (4) did the deprivation deny the defendant a fair trial, thereby requiring that the conviction be set aside? *State* v. *Huff,* 10 Conn. App. 330, 333–34, 523 A.2d 906 (1987); *State* v. *Thurman,* 10 Conn. App. 302, 306–307, 523 A.2d 891 (1987). "The first two questions relate to whether a defendant's claim is reviewable, and the last two relate to the substance of the actual review." *State* v. *Newton,* 8 Conn. App. 528, 531, 523 A.2d 1261 (1986).

The defendant, by claiming that the court's failure adequately to instruct the jury on the dual intent required to convict him as an accessory to a crime amounted to an omission of an instruction on an essential element of the crime charged, has satisfied the first requirement for *Evans* review. *State* v. *Grant,* 6 Conn. App. 24, 28–29, 502 A.2d 945 (1986). Our limited review of the record discloses, however, that the defendant's claim is not truly of constitutional proportions, but is simply characterized as such by him. The trial court read General Statutes § 53a-8 in full, and did not, in its further comments on the meaning of the statute and in its application of the statute to the facts of the case, negate the essential meaning of the statutory language.

See *State* v. *Giannotti,* 7 Conn. App. 701, 706–707, 510 A.2d 451, cert. denied, 201 Conn. 804, 513 A.2d 700 (1986). The statute itself contains the dual intent language. Although the court could have explained the dual intent requirement more fully, we cannot say that its failure to do so amounts to a claim of constitutional proportions. *State* v. *Greene,* 11 Conn. App. 575, 582–83, 528 A.2d 855 (1987). Thus, the defendant has failed to satisfy the second requirement for full *Evans* review because his constitutional claim is not adequately supported by the record. *State* v. *Huff,* supra, 334.

### III

The defendant's next two claims of error relate to his conviction on the larceny offense. The defendant claims (1) that the court's charge to the jury on larceny impermissibly allowed the jury to convict him of an offense with which he was not charged, and (2) that there was insufficient evidence to convict him of larceny in the third degree.

### A

The defendant argues that the trial court unconstitutionally enlarged the offense with which he was charged, when it instructed the jury that it could convict him of larceny if it found that he committed larceny by taking, by obtaining, or by withholding. The governing statute; General Statutes § 53a-119; creates criminal liability under these three alternatives. The information by which the defendant was charged, however, only accused the defendant of violating the statute by a wrongful taking.

The defendant failed to raise this claim at trial or take an exception to the trial court's charge. In fact, he filed a written request that the trial court charge the jury on each alternative form of larceny, along with a

request to charge which included definitions of each alternative. The defendant contends, nevertheless, that this claim is reviewable on appeal under *State* v. *Evans,* supra, because he has been denied a fundamental constitutional right and a fair trial.

Employing the refined *Evans* analysis set forth above, we conclude that, while the defendant has labeled his claim as constitutional, he has failed to satisfy the second requirement for *Evans* review, because his claim is not truly of constitutional proportions. Since the jury was instructed on three methods of committing the same crime, in the absence of a showing that "the court's charge caused him unfair surprise or prejudiced the preparation of his defense"; *State* v. *Franko,* 199 Conn. 481, 490, 508 A.2d 22 (1986); the defendant cannot establish a constitutional violation. "[T]he affirmative action of the defendant in submitting a written request that the trial court instruct the jury on the [obtaining or withholding] theor[ies] of liability negates any claim that he was unfairly surprised by the inclusion of such an instruction in the court's charge. See *State* v. *Franko,* supra, 490–91." *State* v. *Scognamiglio,* 202 Conn. 18, 23, 519 A.2d 607 (1987); see also *State* v. *Silveira,* 198 Conn. 454, 467, 503 A.2d 599 (1986) (error induced by appellant cannot be a ground for reversal and will not be reviewed); *State* v. *Vilhotti,* 11 Conn. App. 709, 713, 529 A.2d 235 (1987) (same).

B

The defendant also argues that the larceny conviction is defective in that the evidence was insufficient to convict him of larceny by taking as charged in the information. Although the defendant has couched his claim in terms of evidentiary insufficiency, in reality his claim is one of instructional error. He argues that the evidence which supports a conviction as an acces-

sory to the taking does not support the theory on which the court submitted the case to the jury, namely, as a principal.[13]

The defendant correctly contends that there was no evidence to convict him of larceny by taking as a principal. He concedes that he could have been convicted of larceny as an accessory notwithstanding the fact that the information charged him only as a principal; *State* v. *Fleming,* 198 Conn. 255, 268 n.15, 502 A.2d 886, cert. denied, 475 U.S. 1143, 106 S. Ct. 1797, 90 L. Ed. 2d 342 (1986); but he argues that the court's charge submitted to the jury only the question of his guilt of larceny as a principal. In support of this argument the defendant points out that, at the conclusion of the court's charge, the state took an exception on the ground that the court had failed to instruct the jury on accessory liability as it related to the larceny charge. The defendant also points out that the court in response to his motion for articulation, concluded that "[t]here was sufficient evidence to submit to the jury the question of the defendant's guilt of the offense [of larceny in the third degree] as a principal," without any mention of his liability as an accessory. Thus, the defendant argues, he could not be convicted as an accessory to the taking. We disagree, because we conclude that the court did submit the case to the jury on a theory of accessorial liability to the taking.

There is no dispute that the evidence in this case was sufficient to convict the defendant of larceny as an

[13] When a person is convicted under more than one statutory alternative, the judgment cannot stand unless the evidence was sufficient to establish guilt under each statutory provision upon which the trier of fact may have relied. See *State* v. *Williams,* 202 Conn. 349, 363–64, 521 A.2d 150 (1987). The defendant does not, however, claim that the evidence was insufficient to convict him of larceny by obtaining or by withholding, as a principal or as an accessory. His claim is only with respect to the alternative of larceny by taking and we therefore limit our review to that statutory basis.

accessory to the taking. Although the charge as given is less than a model of clarity in this respect, we conclude that, fairly read, it adequately instructed the jury on the concept of accessory liability in relation to the larceny charge to support the conviction. Thus, the defendant was properly convicted, as an accessory, of larceny by taking, and his claim of evidentiary insufficiency as to larceny must fail.

A charge to the jury must be reviewed as a whole and considered from the standpoint of its probable effect upon the jurors in guiding them to a proper verdict in the case. *State* v. *McKnight,* 191 Conn. 564, 582, 469 A.2d 397 (1983); *State* v. *Taxiltaridis,* 2 Conn. App. 617, 620, 481 A.2d 98 (1984). For this reason, we are not bound by the views of the court or counsel in resolving this issue. In this case, the court preceded its instruction on accessory liability, by stating: "Now, as to Robert Foshay, the same principle of law as to Burglary in the Third Degree applies to him, but I shall speak to you about another legal principle *which applies to this case* and that is this: Both defendants in this case are charged with Burglary in the Third Degree *and Larceny in the Third Degree.*" (Emphasis added.) Although the remainder of the court's charge was structured so that the accessory liability concept was specifically applied to the evidence in the case only in the context of the burglary offense and prior to any instruction on the elements of the larceny offense, it is likely from the charge as given that the jurors understood accessory liability to apply to both counts. This is so because their attention was drawn to both counts when the concept was explained, and because the evidence in the case indisputably pointed to the defendant's guilt on both intimately related charges only as an accessory. Although it would have been preferable to have linked the accessory instruction more specifically to the instruction on the larceny offense, review-

ing the instructions as a whole and considering them from the standpoint of their probable effect upon the jury in guiding them to a correct verdict, we cannot say that the jury was without adequate legal instruction on the applicability of accessory liability, as contained in General Statutes § 53a-8, to the larceny offense of which the defendant was convicted.

## IV

The defendant's next claim of error is that the court erred by admitting into evidence irrelevant and prejudicial evidence of uncharged misconduct. Specifically, he challenges the admission into evidence of the testimony of Inconstanti that he was in possession of two hypodermic needles at the time of his arrest. The state concedes, and we agree, that the court erred in allowing this testimony. See generally *State* v. *Johnson,* 188 Conn. 515, 523, 450 A.2d 361 (1982). We conclude, however, that the error was harmless. Where, as here, the error involved the admission of extraneous misconduct evidence, the defendant bears the burden of proving harmful error. *State* v. *Silva,* 201 Conn. 244, 250, 513 A.2d 1202 (1986). "The question is whether the trial court's error was so prejudicial as to deprive the defendant of a fair trial, or, stated another way, was the court's ruling, though erroneous, likely to affect the result? *State* v. *Gonzales,* 196 Conn. 115, 119, 491 A.2d 1067 (1985)." *State* v. *Brown,* 199 Conn. 14, 25, 505 A.2d 690 (1986).

We conclude that the defendant has failed to meet his burden of proving the harmfulness of the erroneously admitted evidence. The defendant claims that the challenged testimony permitted the jury to speculate that the defendant was a user of illicit drugs and thereby may have viewed him as more likely to commit these property crimes to finance his drug use. The jury could have reached this conclusion, however, as

much from other, unchallenged evidence as from Inconstanti's testimony. Officer Nelson Carvalho testified without objection that after he saw the defendant tuck something under the seat of the automobile, he reached under the seat and found an eyeglass case containing two syringes. " 'An erroneous ruling should not be considered reversible error if the evidence admitted thereby has already properly entered the case.' " *State v. Randolph,* 190 Conn. 576, 589–90, 462 A.2d 1011 (1983), quoting *State v. Jeustiniano,* 172 Conn. 275, 283, 374 A.2d 209 (1977). Additionally, on the basis of a review of the entire record, we find that it was unlikely that the evidence of the defendant's possession of drug paraphernalia in this case contributed to the verdict.

## V

The defendant's final claims of error relate to the conviction of being a persistent serious felony offender pursuant to General Statutes §§ 53a-40 (b) and 53a-40 (g).[14] The defendant claims that the trial court erred in deny-

---

[14] General Statutes § 53a-40 (b) provides in pertinent part: "A persistent serious felony offender is a person who (1) stands convicted of a felony; and (2) has been, prior to the commission of the present felony, convicted of and imprisoned under an imposed term of more than one year or of death, in this state or in any other state or in a federal correctional institution, for a crime."

General Statutes § 53-40 (g) provides: "When any person has been found to be a persistent serious felony offender, and the court is of the opinion that his history and character and the nature and circumstances of his criminal conduct indicate that extended incarceration will best serve the public interest, the court in lieu of imposing the sentence of imprisonment authorized by section 53a-35 for the crime of which such person presently stands convicted, or authorized by section 53a-35a if the crime of which such person presently stands convicted was committed on or after July 1, 1981, may impose the sentence of imprisonment authorized by said section for the next more serious degree of felony."

In this case, the court pursuant to these statutes, enhanced the defendant's sentences for the class D felonies of burglary in the third degree and larceny in the third degree by imposing sentences authorized for class C felonies.

ing his motion to dismiss this charge, and that the part of the information accusing him of being a persistent serious felony offender did not give him fair notice that he faced enhancement of his sentence on *both* of the underlying felony counts of which he was convicted in this case.

The facts relevant to these claims are as follows. The defendant was originally charged in a two-part information, the first part of which was a short form document, and the second part of which was in a long form format. In the short form document, the defendant was charged with third degree burglary, third degree larceny, illegal possession of narcotics, and possession of drug paraphernalia. The long form document accused the defendant of being a persistent serious felony offender pursuant to General Statutes § 53a-40 (b).

The defendant filed a motion for a bill of particulars. With the defendant's consent, the state complied with the order to provide a bill of particulars by filing a long form information detailing the burglary and larceny counts. The drug related offenses contained in the original short form information were not included in the long form information. No new long form information was provided with respect to the persistent serious felony offender charge. Subsequently, the state filed an amended long form information containing the two substantive counts.

## A

Prior to trial on the persistent serious offender charge, the defendant moved to dismiss that charge, arguing that the court lacked jurisdiction over this charge because it had not been included in the amended information, and that such a charge under § 53a-40 cannot be made in a separate information. The trial court denied the motion.

The defendant correctly points out that "[a] person cannot be charged as a persistent offender under § 53a-40 in a separate information or indictment. If the allegation of prior offenses is not included in an information or indictment charging a specific crime, it is ineffective." *State* v. *Lewis,* 176 Conn. 270, 272–73, 407 A.2d 955 (1978). The defendant incorrectly asserts, however, that the original long form information charging him under § 53a-40 somehow disappeared when the amended information was filed following his motion for a bill of particulars. Since an information which alleges both a substantive charge and a recidivist charge must be in two separate parts; Practice Book § 619; and since the charge under § 53a-40 was already in long form in this case, it elevates form over substance to require the state to supply the defendant with another copy of the § 53a-40 portion of the information when it is clear that it was amending only the first part of the information as to its particulars. "The purpose of the rule requiring that the substantive and persistent felony offender violations be contained in the same indictment is to give the defendant adequate notice of the charges against him so that he may properly prepare his defense." *State* v. *Secore,* 194 Conn. 692, 701, 485 A.2d 1280 (1984). Here, the record amply demonstrates that the defendant had notice of the recidivist charge and was not prejudiced or unfairly surprised when the second part of the information came to trial. Indeed, in the course of the defendant's argument on one of his speedy trial motions, after the state's amended information was filed, the defendant made clear that he still considered himself subject to the persistent serious offender charge. In the absence of a showing of prejudice or unfair surprise, we conclude that the trial court did not err in denying the defendant's motion to dismiss the persistent serious felony offender charge.

## B

The defendant also argues that the trial court, after finding him to be a persistent serious felony offender as charged in the second part of the information, erred in enhancing his sentence on *both* substantive offenses pursuant to General Statutes § 53a-40(g), because the information contained only a single allegation that the defendant was a persistent serious felony offender. The defendant argues that the single count of being a persistent serious felony offender deprived him of adequate notice that the state sought an enhanced sentence on both the burglary and the larceny offenses. We disagree.

There is nothing in the record to indicate that the defendant was surprised by the ultimate enhancement of the sentences on both underlying offenses. A single persistent serious felony offender charge included in an information accusing a person of two substantive counts, to which the same recidivist provision applies, both logically and legally indicates that the state intends to seek an enhanced sentence on any conviction arising out of the first part of the information. Consequently, the defendant's claim that he was denied his constitutional right to notice of the charges against him based on the single count persistent offender allegation is without merit. Cf. *State* v. *Scognamiglio,* supra, 21–25.

There is no error.

In this opinion the other judges concurred.